# Davidoff Declaration
# Exhibit 1

# COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES

República Argentina
Ley 20305

# LEGALIZACIÓN

El COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES, en virtud de la facultad que le confiere el artículo 10 inc. d) de la Ley 20305, certifica que el/la Traductor/a Público/a **FALABELLA, JUAN MANUEL**

cuya firma digital consta en la traducción pública adjunta, se encuentra matriculado/a en esta institución en el idioma **INGLÉS [TOMO 19 - FOLIO 82]**

Asimismo, se deja constancia de que el/la profesional está habilitado/a por esta institución para firmar documentos en su calidad de Traductor/a Público/a.

Firmado digitalmente por: **MARSILI, EXEQUIEL RODRIGO**

Identificador de legalización: **7210178403067917867953056a5625d701033**

Ciudad Autónoma de Buenos Aires, **14/07/2026**

Colegio de Traductores Públicos
de la Ciudad de Buenos Aires

MARSILI Exequiel Rodrigo

Firmado digitalmente por MARSILI Exequiel Rodrigo
Fecha: 2026.07.14 09:08:58 -03'00'

Legalización firmada digitalmente conforme a la Ley 25506, a la Ley 2751 y sus reglamentaciones complementarias.

ESTA LEGALIZACIÓN NO IMPLICA JUICIO ALGUNO SOBRE EL CONTENIDO DE LA TRADUCCIÓN PÚBLICA Y SERÁ VÁLIDA ÚNICAMENTE SI ESTÁ FIRMADA DIGITALMENTE POR LA PERSONA DEBIDAMENTE AUTORIZADA POR EL CTPCBA.

Para verificar documentos digitales, ingrese a:
https://firmar.gob.ar/validar.html
Para saber cómo visualizar la totalidad de los documentos embebidos en este archivo .pdf, ingrese a:
https://www.traductores.org.ar/matriculados/firma-digital/
Para verificar la validez de esta legalización, ingrese a:
https://www.traductores.org.ar/publico/como-verifico-una-legalizacion-digital/

Colegio de Traductores Públicos
de la Ciudad de Buenos Aires

By virtue of the authority vested in the COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES (CTPCBA) (Buenos Aires Sworn Translators Association), by Argentine law No. 20305 section 10(d), I hereby CERTIFY that the Certified Translator whose digital signature is affixed on the document attached hereto is registered with this Association. This certification does not imply any opinion on the contents of the translation and will be valid only if digitally signed by the duly authorized signatory of the CTPCBA.

Vu par le COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES (CTPCBA) (Ordre des Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions qui lui ont été accordées par l'article 10, alinéa d) de la Loi n° 20305, CERTIFIE que le Traducteur/Traductrice Officiel/le, dont la signature numérique est apposée sur le document ci-joint, est inscrit/e à cette Institution. Cette légalisation n'implique aucun avis sur le contenu de la traduction et ne sera pas valable sans la signature numérique du fonctionnaire habilité par le CTPCBA.

Il COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES (CTPCBA) (Ordine dei Traduttori abilitati della Citta di Buenos Aires) , in virtù delle facoltà conferite dall'articolo 10, lettera d) della legge 20.305, CERTIFICA che la Traduttrice Giurata/il Traduttore Giurato, la cui firma digitale si riporta sul documento allegato, è registrata/o presso questo Ente. Questa legalizzazione non prevede alcun giudizio sul contenuto della traduzione e non sarà valida senza la relativa firma digitale del funzionario autorizzato dal CTPCBA.

Por meio desta legalização, o COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES (CTPCBA) (Colégio dos Tradutores Públicos da Cidade de Buenos Aires), no uso de suas atribuições e em conformidade com o artigo 10, alínea "d", da Lei 20.305, CERTIFICA que a Tradutora Pública/o Tradutor Público cuja assinatura digital consta no documento anexo, está inscrita/o nesta instituição. Este reconhecimento não diz respeito ao conteúdo da tradução e não será válido sem a assinatura digital correspondente ao funcionário habilitado pelo CTPCBA.

COLEGIO DE TRADUCTORES PUBLICOS DE LA CIUDAD DE BUENOS AIRES (CTPCBA) (Kammer der vereidigten Übersetzerinnen und Übersetzer der Stadt Buenos Aires). Kraft der Befugnisse, die ihr gem. Art. 10 Abs. d) des Gesetzes Nr. 20.305 zustehen, bescheinigt diese Kammer hiermit lediglich, dass die vereidigte Übersetzerin bzw. der vereidigte Übersetzer, deren/dessen digitale Signatur auf vorstehend beigefügter Urkunde gesetzt ist, dieser Berufskammer angehört. Diese Beglaubigung bezieht sich nicht auf den Inhalt der Übersetzung und ist nur mit der entsprechenden digitalen Signatur der bzw. des von der CTPCBA ermächtigten Bestätigungsbefugten gültig.

**TRADUCCIÓN PÚBLICA / SWORN**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

---

## AES Corporation

Claimant

v.

## Argentine Republic

Respondent

---

**ICSID Case No. ARB/02/17**

# APPLICATION OF THE ARGENTINE REPUBLIC FOR ANNULMENT AND STAY OF ENFORCEMENT OF THE AWARD

September 26, 2025

**OFFICE OF THE TREASURY ATTORNEY GENERAL**

Posadas 1641

C1112ADC Buenos Aires

Argentine Republic

## TABLE OF CONTENTS

**page**

I. PURPOSE ....................................................................................................1

II. PROCEDURAL BACKGROUND ....................................................................2

III. RELEVANT BACKGROUND TO THE DISPUTE .............................................4

IV. GROUNDS OF THE ARGENTINE REPUBLIC FOR ANNULMENT OF THE AWARD ....................................................................................................6

IV.A. The Tribunal Manifestly Exceeded Its Powers ..............................................7

IV.A.1. The Tribunal Exceeded Its Jurisdiction ..............................................8

IV.A.2. The Tribunal Failed to Apply the Law Applicable to the Dispute ........9

IV.B. The Tribunal Seriously Departed from Fundamental Rules of Procedure .............9

IV.C. THE AWARD FAILS TO STATE THE REASONS ON WHICH IT IS BASED ....................................................................................................13

IV.C.1. The Award Failed to State Reasons for the Conclusions It Reached ..13

IV.C.2. The Award Contains Contradictory Reasoning ..................................15

IV.C.3. The Award Includes Frivolous Reasoning Equivalent to an Absence of Reasons ....................................................................................18

V. STAY OF ENFORCEMENT OF THE AWARD ...............................................20

VI. REQUEST FOR RELIEF ...............................................................................20

**GLOSSARY OF TERMS**

| | |
|---|---|
| **§(§)** | section(s) |
| **¶(¶)** | paragraph(s) |
| **2008–2011 Agreement** | 2008-2011 Agreement for the Management and Operation of Projects, Increase in Thermal Generation Availability and Adjustment of Remuneration for Generation signed on 25 November 2010 |
| **AES** | AES Corporation |
| **Application for Annulment** | Application by the Argentine Republic dated 26 September 2025, for annulment and Stay of Enforcement of the Award issued in the arbitration proceeding *AES Corporation v. the Argentine Republic* (ICSID Case No. ARB/02/17) |
| **Arbitration Rule(s)** | Rules of Procedure for Arbitration Proceedings of the International Centre for Settlement of Investment Disputes, in force as of 26 September 1984 |
| **Argentina** | Argentine Republic |
| **Argentina-US BIT or BIT** | Treaty Between the Argentine Republic and the United States of America Concerning the Reciprocal Encouragement and Protection of Investment, signed on November 14, 1991, and in force since October 20, 1994 |
| **ARS** | Argentine pesos |
| **Art.** | Article |
| **Award** | Award issued on 30 May 2025, in the arbitration proceeding *AES Corporation v. the Argentine Republic* (ICSID Case No. ARB/02/17) |
| **CAMMESA [for its acronym in Spanish]** | Managing Company of the Wholesale Electricity Market Corp. [*Compañía Administradora del Mercado Mayorista Eléctrico S.A.]* |
| **Centre / ICSID** | International Centre for Settlement of Investment Disputes |
| **Claimant** | AES Corporation |

| | |
|---|---|
| **Decision on Jurisdiction** | Decision on Jurisdiction issued on 26 April 2005, in the arbitration proceeding *AES Corporation v. the Argentine Republic* (ICSID Case No. ARB/02/17) |
| **Definitive Agreement** | Definitive Agreement for the Management and Operation of Projects for the Readjustment of the Wholesale Electricity Market, signed on 17 October 2005 |
| **Electricity Law** | Law No. 24,065 |
| **Emergency Law** | Law No. 25,561 on Public Emergency and Foreign Exchange System Reform |
| **FONINVEMEM** | Fund for Investments Necessary to Increase the Supply of Electric Power in the Wholesale Electricity Market [*Fondo para Inversiones Necesarias que Permitan Incrementar la Oferta de Energía Eléctrica en el Mercado Eléctrico Mayorista*] |
| **MEM [for its acronym in Spanish]** | Wholesale Electricity Market [*Mercado Eléctrico Mayorista*] |
| **Respondent** | Argentine Republic |
| **SE** | Secretariat of Energy |
| **USD** | United States dollars |
| **WACC** | Weighted average cost of capital |

# APPLICATION OF THE ARGENTINE REPUBLIC FOR ANNULMENT AND STAY OF ENFORCEMENT OF THE AWARD

The Argentine Republic (**"Argentina"** or **"Respondent"**) respectfully submits this Application for Annulment and Stay of Enforcement of the Award (**"Application for Annulment"**) in AES Corporation v. Argentine Republic (ICSID Case No. ARB/02/17).

## I. PURPOSE

1. Pursuant to Article 52 of the ICSID Convention and Arbitration Rule 50 of the [1984] ICSID Arbitration Rules, the Argentine Republic requests annulment of the Award dated May 30, 2025 ("**Award**"), of which the Decision on Jurisdiction dated April 26, 2005 ("**Decision on Jurisdiction**") forms part.

2. This Application for Annulment is submitted within 120 days from the date of issuance of the Award. The allocation by the Argentine Republic of USD 25,000 (twenty-five thousand United States dollars) as the lodging fee for the Application for Annulment, as provided for in Regulation 16 (Fee for Lodging Requests) of the Centre's Administrative and Financial Regulations and in the Schedule of Fees in force since July 1, 2023, has been confirmed by the ICSID Secretariat.[1]

3. This Application for Annulment is based on the following grounds:

   - the Tribunal manifestly exceeded its powers (Article 52(1)(b) of the ICSID Convention);
   - the Tribunal seriously departed from fundamental rules of procedure (Article 52(1)(d) of the ICSID Convention); and
   - the Award has failed to state the reasons on which it is based (Article 52(1)(e) of the ICSID Convention).

4. Likewise, pursuant to Article 52(5) of the ICSID Convention and Arbitration Rule 54(1), the Argentine Republic requests a stay of enforcement of the Award until this Application for Annulment is decided.

[1] On September 11, 2025, by email, the ICSID Secretariat confirmed that, on September 12, 2025, the funds in the amount of USD 25,000 corresponding to the lodging fee for the Application for Annulment in this case would be allocated. On September 23, 2025, also by email, the Secretariat confirmed that the internal transfer of the funds had become effective on September 12, 2025.

## II. PROCEDURAL BACKGROUND

5. The arbitral proceeding commenced with the filing of the Request for Arbitration submitted by AES Corporation ("**AES**" or "**Claimant**"), a company incorporated in the State of Delaware, United States of America, on November 5, 2002. The Request for Arbitration was registered by the Secretary-General of ICSID on December 19, 2002.

6. On June 3, 2003, the Tribunal was constituted, composed of Professor Karl-Heinz Böckstiegel—a national of the Federal Republic of Germany and appointed by Claimant—Professor Domingo Bello Janeiro—a national of the Kingdom of Spain and appointed by Argentina—and Professor Dr. Pierre-Marie Dupuy—President of the Tribunal, a national of the Republic of France, and selected by the Secretary-General of ICSID in accordance with the parties' agreement.

7. Claimant filed its Memorial on the Merits on October 7, 2003. AES's claim concerned a series of measures that allegedly affected its investment, defined as its direct or indirect equity interest in eight electricity generation companies[2] and three electricity distribution companies[3] in Argentina. The claim was brought under the Treaty Between the Argentine Republic and the United States of America Concerning the Reciprocal Encouragement and Protection of Investment ("**Argentina–U.S. BIT**" or the "**BIT**").

8. In general terms, Claimant complained of the effects of Law No. 25,561 on Public Emergency and Foreign Exchange System Reform ("**Emergency Law**") and the break in parity between the peso and the dollar with respect to its assets in the distribution sector, as well as a series of measures adopted by the Secretariat of Energy ("**SE**") that allegedly distorted the basic principles of the Wholesale Electricity Market ("**MEM**") regulated by Law No. 24,065 ("**Electricity Law**"). Furthermore, AES complained of the measures adopted by the SE during 2002 and 2003 that modified the regulatory regime to address the crisis.[4] AES alleged that such measures purportedly violated the standards of fair and

---

[2] Central Térmica San Nicolás, Central Hidroeléctrica Cabra Corral, Central Hidroeléctrica El Tunal, Central Hidroeléctrica Ullum, Central Térmica Central Sarmiento, Central Térmica Paraná, Hidroeléctrica Alicurá, Central TermoAndes.

[3] Empresa Distribuidora La Plata S.A. ("EDELAP"), Empresa Distribuidora de Energía Norte S.A. ("EDEN"), and Empresa Distribuidora de Energía Sur S.A. ("EDES").

[4] Claimant's Original Memorial, ¶ 53.

equitable treatment, full protection and security, treatment no less favorable than that required by international law, protection against arbitrary or discriminatory measures, observance of commitments entered into with respect to investments, and protection in relation to expropriation provided for in the Argentina–U.S. BIT.

9. On December 31, 2003, Argentina filed its Memorial on Jurisdiction. On February 18, 2004, the Tribunal ordered bifurcation of the proceeding. Claimant filed its Counter-Memorial on Jurisdiction on February 20, 2004; Argentina filed its Reply on Jurisdiction on March 26, 2004; and Claimant filed its Rejoinder on Jurisdiction on April 26, 2004. A hearing on jurisdiction was held on October 23 and 24, 2004. The Tribunal issued the Decision on Jurisdiction on April 26, 2005, rejecting the objections raised by Argentina.

10. On September 8, 2005, Argentina filed its Counter-Memorial on the Merits.

11. In December 2005, in connection with the renegotiation of the distribution concession contracts and the tariff review process, together with the SE's call to generators interested in participating in the program of the Fund for the Investments Necessary to Increase the Supply of Electric Power in the Wholesale Electricity Market ("**FONINVEMEM**"), the parties agreed to suspend the arbitral proceeding. That suspension was extended every six months for more than 13 years (between January 23, 2006, and December 11, 2018). The purpose of the suspension was to attempt to reach an amicable settlement of the dispute. As the Tribunal acknowledges, the request for a suspension "refers expressly to the Adhesion Act approved by Resolution SE No. 1427/2004 and the Definitive Agreement approved by Resolution No. 1193/2005."[5] However, despite the fact that those agreements were being performed, on December 11, 2018, Claimant stated its intention to resume the proceeding.

12. The proceeding was resumed on January 11, 2019, at Claimant's request.

13. On January 27 and 28, 2019, respectively, Professors Dupuy and Böckstiegel notified the Arbitral Tribunal of their resignations. On July 7, 2019, Mr. Stephen L. Drymer—a Canadian national—accepted his appointment as arbitrator, having been appointed by Claimant. On December 2, 2019, the Chairman of the ICSID Administrative Council

[5] Award, ¶ 133.

appointed Professor Ricardo Ramírez Hernández—a Mexican national—as President of the Arbitral Tribunal. The Arbitral Tribunal was reconstituted on December 12, 2019.

14. On April 24, 2020, Claimant filed its Updated Memorial. The new claim differed from the original claim in that, in the Updated Memorial, AES: (i) withdrew all claims concerning its equity interest in the electricity distribution companies (EDEN, EDES, and EDELAP) and in the generation company Central Dique; (ii) withdrew its claims for alleged expropriation and under the umbrella clause; and (iii) completely changed the valuation method. However, the total amount claimed increased considerably. AES claimed USD 1.814 billion, in contrast with the USD 154 million it had claimed in 2003, 73% of which related to its investment in the electricity distribution sector, which was no longer part of the 2020 claim.

15. Argentina filed an Updated Counter-Memorial on October 22, 2020. Claimant filed its Reply on March 26, 2021, and Argentina filed its Rejoinder on July 30, 2021.

16. The hearing on the merits took place between February 6 and 16, 2023, at the ICSID headquarters in Washington, D.C. On June 23, 2023, the parties filed their Post-Hearing Briefs. On May 2, 2024, the parties filed their updated submissions on costs.

17. On May 12, 2025, the Tribunal declared the proceeding closed. On May 30, 2025, the Tribunal issued the Award.

## III. RELEVANT BACKGROUND TO THE DISPUTE

18. The dispute concerns measures in the electricity generation sector in the Argentine Republic.[6] The regulatory framework for this sector is based on the Electricity Law, which declared electricity generation activities to be of general interest,[7] delegating broad powers to the SE to regulate the MEM.[8] In turn, Decree No. 1192/92 created Compañía Administradora del Mercado Mayorista Eléctrico S.A. ("**CAMMESA**"), which is responsible for administering the MEM.[9] CAMMESA is an Argentine corporation in which

[6] Although it had originally included a claim concerning measures in the electricity distribution sector, AES discontinued that claim on August 9, 2006, and November 14, 2011.

[7] Law No. 24,065, December 19, 1991, Art. 1.

[8] Law No. 24,065, December 19, 1991, Arts. 35 and 36.

[9] Decree No. 1,192/1992, July 21, 1992, Art. 1.

the Federal Government holds only 20% of the shares. The remaining 80% is distributed in equal shares among the Association of Electric Power Generators, the Association of Electric Power Distributors, the Association of Electric Power Transmitters, and the Association of Large Electric Power Users.[10]

19. In mid-1998, a series of external shocks affected the Argentine economy, giving rise to a prolonged recession that culminated, in late 2001, in the collapse of the Convertibility regime and the most serious crisis in Argentine history, also considered one of the most severe crises worldwide. The crisis was economic, financial, exchange-rate, social, and political in nature.

20. To address the crisis, Argentina adopted various measures. In January 2002, Congress declared a public emergency in social, economic, administrative, financial, and exchange-rate matters by enacting the Emergency Law.[11] Among other provisions, that law formally ended the exchange-rate parity between the peso and the United States dollar. A few days after the Emergency Law was enacted, the Executive Branch of the Argentine Republic ordered the conversion into pesos of all obligations to pay sums of money, regardless of their cause or origin, denominated in dollars or other foreign currencies, existing at the time the Emergency Law was enacted and not already converted into pesos.[12]

21. Likewise, the SE was required to adapt the regulations governing the electricity sector to the new circumstances and make the adjustments necessary to prioritize the system's short-term operability and the recognition of the operating costs incurred by generating agents. The measures adopted included: (i) standardizing the monetary units used in the regulation of the electricity sector; (ii) modifying the calculation of the spot price and adopting measures to ensure that generators recovered their operating costs; (iii) creating incentives to ensure the availability of thermal generators and financing maintenance; (iv) increasing capacity payments and decoupling them from actual dispatch in order to incentivize the availability of thermal generators; and (v) creating new remuneration mechanisms for

[10] Decree No. 1,192/1992, July 21, 1992, Art. 3.

[11] Law No. 25,561, January 6, 2002, Arts. 2 and 3.

[12] Decree No. 214/02, February 3, 2002, Art. 1.

capacity availability reserves backed by fuel guarantees and reliability guarantees in order to ensure the provision of electricity service.

22. After the arbitration had commenced, the parties entered into settlement negotiations that led to the suspension of this arbitral proceeding for more than 13 years and to the execution of successive agreements pursuant to which the differences between the parties were resolved. Indeed, in December 2005, in connection with the renegotiation of the distribution concession contracts and the tariff review process, together with the Secretariat of Energy's call to generators interested in participating in the FONINVEMEM program, the parties agreed to suspend the arbitral proceeding. That suspension was extended every six months for more than 13 years until, in late 2018, Claimant notified Argentina of its intention to resume the proceeding.

23. The generators, led by AES, entered into agreements with Argentina, including: the Definitive Agreement for the Management and Operation of Projects for the Readjustment of the Wholesale Electricity Market, signed in 2005 ("**Definitive Agreement**"), and the 2008–2011 Agreement for the Management and Operation of Projects, Increase in Thermal Generation Availability and Adjustment of Remuneration for Generation, signed in 2010 ("**2008–2011 Agreement**"), as well as their express acceptance of the remuneration regime established in SE Resolution No. 95/13.

## IV. GROUNDS OF THE ARGENTINE REPUBLIC FOR ANNULMENT OF THE AWARD

24. Article 52(1) of the ICSID Convention sets forth the grounds warranting annulment of an arbitral award: (a) improper constitution of the Tribunal; (b) manifest excess of powers by the Tribunal; (c) corruption on the part of a member of the Tribunal; (d) serious departure from a fundamental rule of procedure; and (e) failure to state the reasons on which the award is based. The same Article provides that the parties may allege the existence of one or more of these grounds and even permits more than one ground to be invoked with respect to the same aspect of the award.[13]

[13] *Togo Electricité and GDF-Suez Energie Services v. Republic of Togo*, ICSID Case No. ARB/06/07, Decision on Annulment of September 6, 2011, ¶ 52.

25. In this Application for Annulment, Argentina submits that the Award is affected by defects falling within the grounds set forth in subparagraphs (b), (d), and (e) of Article 52(1) of the ICSID Convention.[14]

## IV.A. The Tribunal Manifestly Exceeded Its Powers

26. *Ad h*oc committees have consistently held that a tribunal exceeds its powers when it goes beyond the exercise of the jurisdiction conferred upon it by the parties to a dispute, including jurisdictional parameters, the applicable law, and the issues raised by the parties.[15] This ground for annulment arises both when a tribunal assumes powers it does not have and when it fails to exercise powers it does have.[16]

27. As regards jurisdictional parameters, tribunals may exceed their powers by deciding a part of the dispute over which they lack jurisdiction or by exceeding the scope of their competence, as well as by failing to exercise jurisdiction that was legitimately and effectively conferred upon them.[17] It has also been held that arbitral tribunals exceed their powers when they decide issues falling outside the scope of the case, that is, when there is an excess of jurisdiction.[18] In other words, a tribunal exceeds its powers if it exercises jurisdiction that it does not possess.

28. With respect to the failure to address issues raised by the parties, *ad hoc* committees have held that arbitral tribunals exceed their powers when they disregard matters that are crucial or decisive to the decision.[19]

---

[14] The passages of the Award identified or quoted below, by way of example, are only some of the many passages illustrating the grounds for annulment invoked in this Application for Annulment. Exhaustive references to the Award will be provided in detail at the appropriate procedural stage.

[15] *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *Ad Hoc* Committee on the Application for Annulment of Mr. Soufraki's of June 5, 2007, ¶¶ 42–45.

[16] *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment of February 26, 2016, ¶ 126; *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee of March 1, 2011, ¶ 97.

[17] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award of November 2, 2015, ¶ 50.

[18] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. (formerly Compagnie Générale des Eaux) v. Argentine Republic*(I), ICSID Case No. ARB/97/3, Decision on Annulment of July 3, 2002, ¶ 86.

[19] Togo Electricité and GDF-Suez Energie Services v. Republic of Togo, ICSID Case No. ARB/06/07, Decision on Annulment of September 6, 2011, ¶ 57.

29. Likewise, a Tribunal exceeds its powers when it fails to apply the law applicable to the dispute. To determine whether a tribunal has failed to apply the applicable law, it is necessary to identify the law applicable to the dispute, the law applied by the tribunal, and whether there are reasons to conclude that its decision constituted a departure from the applicable law.[20] *Ad hoc* committees agree that arbitrators may decide only within the limits established by the consent given by the parties with respect to the applicable law and that, if the tribunal wholly disregards the applicable law or bases its conclusions on a law different from that applicable pursuant to Article 42 of the ICSID Convention, it thereby manifestly exceeds the mandate conferred upon it.[21]

30. In any event, an excess of powers is manifest when it is clear or readily apparent.[22] In this case, the Tribunal's excess of authority is not only manifest but also substantial, which has seriously affected the reasoning and conclusions set forth by the Tribunal in the Award. The excess of powers is also multiple, insofar as the Tribunal exceeded the exercise of its powers on numerous occasions.

**IV.A.1. The Tribunal Exceeded Its Jurisdiction**

31. The Tribunal exceeded its powers by assuming jurisdiction over a dispute that no longer existed. Indeed, Claimant had waived, through its subsidiaries, its right to assert claims concerning the measures at issue in the arbitration. Those waivers were multiple (in the 2005 Definitive Agreement, the 2008–2011 Agreement, and SE Resolution No. 95/2013), and all occurred after the commencement of the arbitral proceeding. Thus, there could be no doubt that, when the arbitral proceeding was resumed in 2019, the dispute had ceased to exist and the Tribunal had lost jurisdiction over those waived claims. Consequently, when the Tribunal assumed jurisdiction and decided those claims, it exercised powers *ultra petita*, warranting annulment of the Award.

---

[20] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment of March 21, 2007, ¶ 59.

[21] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award of November 2, 2015, ¶ 54.

[22] Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016, ¶ 83.

### IV.A.2. The Tribunal Failed to Apply the Law Applicable to the Dispute

32. The Tribunal manifestly exceeded its powers by failing to apply Argentine law, the BIT, and customary international law,[23] and by disregarding international law on damages. Although the Tribunal acknowledged that there must be a causal relationship between the challenged measures and the alleged harm,[24] and that damages must be proven,[25] the Tribunal failed to apply those principles. Indeed, it did not identify which measures caused which damages and at what point in time. Instead, it merely stated that the fact that a measure violates the BIT means that the damage has been caused.[26]

### IV.B. The Tribunal Seriously Departed from Fundamental Rules of Procedure

33. For the ground of serious departure from a fundamental rule of procedure to be established, the following requirements must be met: (i) the rule of procedure must be fundamental, and (ii) the Tribunal must have departed from it in a "serious" manner. It is generally accepted that the fundamental nature of a rule of procedure corresponds to a "set of minimal standards of procedure to be respected as a matter of international law."[27] This includes, for example, equal treatment of the parties, their right to be heard, the independent and impartial character of the Tribunal, the proper treatment of evidence, and the burden of proof.[28] Ultimately, this ground for annulment "has a wide scope and includes principles of natural justice"[29] and, in short, "has to do with procedural matters. Examples of fundamental rules of procedure that ad hoc committees have identified include equal treatment of parties, the right to be heard and treatment of evidence and burden of proof."[30]

---

[23] The applicable principles or rules of customary international law are listed in the Dissent on the Merits, ¶ 380.

[24] Award, ¶¶ 447, 465.

[25] Award, ¶ 452.

[26] Award, ¶ 465.

[27] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated December 8, 2000 of February 5, 2002, ¶ 57.

[28] *See*, *e.g.,* Updated Background Paper on Annulment for the Administrative Council of ICSID, March 2024, ¶ 105.

[29] Updated Background Paper on Annulment for the Administrative Council of ICSID, March 2024, ¶ 104.

[30] *Rockhopper Italia S.P.A., Rockhopper Mediterranean LTD., and Rockhopper Exploration PLC v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on Annulment of June 2, 2025, ¶ 222.

34. For its part, determining the seriousness of the alleged departure generally requires demonstrating the impact that the departure could have had on the award.[31] This does not mean that it must be proven that the departure was decisive to the award rendered, but rather that proper compliance with the rule that was violated could potentially have led to a different outcome.[32]

35. In the present case, the Tribunal seriously departed from fundamental rules of procedure by disregarding minimum procedural standards under international law (such as the right to be heard, due process, equal treatment of the parties, and the rules governing the burden of proof), thereby undermining the integrity of the arbitral process as a whole. This occurred not only in relation to the merits, but also in the analysis and determination of the damages claim.

36. First, despite Argentina's repeated requests, the Tribunal did not grant it access to the underlying basis of Claimant's valuation model, namely, the dispatch model concerning prices and the evolution of the gas market prepared by Quantum América at Claimant's request. That model underpinned the entirety of the damages claimed by Claimant in connection with dispatch- and price-related measures. By depriving Argentina of that evidence, its right of defense was violated.

37. Moreover, the Tribunal relied on that model after stating that the Respondent had not requested access to it. This is false. The Respondent requested that model both in its Updated Counter-Memorial and in its Rejoinder, where it explained the basis for those requests and the consequences if Argentina and the Tribunal did not have access to that model, as well as how this circumstance prevented them from understanding how it worked, replicating it and, where appropriate, modifying it in order to run alternative scenarios. Consequently, relying on a false fact, the Tribunal justified its reliance on Quantum América's model to calculate damages, without addressing Argentina's arguments explaining the relevance of having access to that model.

---

[31] *Víctor Pey Casado and the Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment filed by the Republic of Chile of December 18 2012, ¶ 78.

[32] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated December 8, 2000 of February 5 2002, ¶ 58. [33] Award, ¶ 515.

38. On the other hand, although the Tribunal correctly acknowledged that "the Claimant bears the burden of proof with respect to the damages calculation,"[33] it stated that Argentina's failure to submit an alternative valuation model had been—at the very least—unhelpful, noting that "having recourse to an alternative or comparative model which address the same hypothetical could have given the Tribunal more elements with which to assess, compare and contrast Claimant's valuation."[34] Ultimately, the Tribunal reversed the burden of proof by criticizing Argentina for failing to submit a model when, in fact, it was Claimant that was required to prove the alleged damages and allow the evidence supporting its calculation to be tested by both Respondent and the Tribunal.

39. Thus, in order to quantify the alleged damages, the Tribunal had two options: (i) accept all the parameters proposed by Claimant or (ii) find that Claimant had failed to meet its burden of proof and dismiss its monetary claim. Since the lack of access to Quantum América's dispatch model prevented the Tribunal from modifying any of the parameters of AES's quantification, including the valuation date, because doing so would have required rerunning the dispatch model, which is not part of the record, the only possible solution available to the Tribunal, in accordance with the rules of due process, was to find that Claimant had failed to meet its burden of proof.

40. Ultimately, the valuation and quantification of the damages claimed are based on a dispatch model that could not be tested by either Respondent or the Tribunal, Respondent having been deprived of the right to access it. This constitutes a serious departure from rules of procedure.

41. Second, the Tribunal denied Respondent the right to cross-examine relevant witnesses presented by Claimant, Messrs. Fernando Pujals and Eduardo Dutrey. Argentina's request was based on the fact that those witnesses were crucial to the resolution of the case, since they were key actors in the process concerning the agreements entered into within the framework of FONINVEMEM, the waivers contained therein, and the manner in which AES's Argentine generators expressed their agreement with the measures in respect of which AES asserted claims in the arbitration. Despite Argentina's repeated requests to

---

[33] Award, ¶ 515.

[34] Award, ¶ 515.

cross-examine them, the Tribunal did not summon them to the Hearing and merely urged Claimant to use its best efforts to enable both witnesses to participate in the Hearing.

42. Claimant's claim is based on alleged expectations and alleged coercion at the time of entering into the agreements with the Federal Government, as well as the waivers related to those agreements. However, neither the Tribunal nor Argentina had the opportunity to cross-examine these two key witnesses who were directly connected with the facts alleged by Claimant.

43. Although, following Argentina's repeated insistence, the Tribunal ordered Claimant to use its best efforts to ensure the appearance of those witnesses at the hearing on the merits, the fact remains that Claimant maintained its refusal, and neither of them appeared for cross-examination, not even virtually. In light of Claimant's conduct, depriving Argentina and the Tribunal of such evidence, the Tribunal should have drawn the corresponding adverse inferences. However, it failed to do so, thereby seriously departing from fundamental rules of procedure concerning the consequences that must be drawn from the conduct of parties when they conceal or deprive the Tribunal and the other party of fundamental evidence in an arbitral proceeding.

44. This circumstance is compounded by the fact that, on several occasions, the Tribunal failed to consider the evidence submitted by Argentina without providing any explanation for disregarding it. For example, it disregarded the extensive evidence confirming the approval with which the Argentine generators engaged with the Federal Government, even congratulating themselves on what they—the generators and the Federal Government—were achieving together, as well as the evidence confirming that Claimant itself portrayed its investment in Argentina in the United States as a profitable and expanding business. Despite all that evidence, the Tribunal concluded that the generators were "captive" to Argentina, which allegedly led them to accept the agreements, and that, for that reason, the FONINVEMEM program was an arbitrary measure.[35] The Tribunal adopted a similar approach with respect to the award in *Orazul International España Holdings S.L. v. Argentine Republic* (ICSID Case No. ARB/19/25), which decided exactly the same facts

[35] *See* Award, ¶¶ 307–333.

to which AES's claim referred and on which the parties extensively argued. The parties extensively addressed that decision, explaining why it was or was not applicable to the AES case. The Tribunal makes no reference whatsoever to the reasoning and conclusions of the tribunal's decision in Orazul v. Argentina. This constitutes a departure from the fundamental rule of procedure embodied in the right to be heard.[36]

## IV.C. THE AWARD FAILS TO STATE THE REASONS ON WHICH IT IS BASED

45. The Award also fails to state the reasons on which it is based by preventing the reader from following the Tribunal's reasoning on issues of fact or law relevant to deciding the dispute.[37] This ground, which under Article 48(3) of the ICSID Convention[38] warrants annulment of the Award, is established, among other circumstances, when there is a partial or total absence of reasoning in an award or part thereof, the use of contradictory, insufficient, inadequate, or frivolous reasons,[39] or the failure to address and/or decide arguments or evidence submitted by the parties that are substantial to the resolution of the dispute.[40]

### IV.C.1. The Award Failed to State Reasons for the Conclusions It Reached

46. On multiple occasions, the Tribunal failed to state the reasons underlying the conclusions it reached.

---

[36] At the same time, this contradicts what this Tribunal decided in the Decision on Jurisdiction when it held that "one can hardly deny that the institutional dimension of the control mechanisms provided for under the ICSID Convention might well be a factor, in the longer term, for contributing to the development of a common legal opinion or *jurisprudence constante*, to resolve some difficult legal issues discussed in many cases, inasmuch as these issues share the same substantial features." Decision on Jurisdiction, ¶ 33. On the basis of that premise, the Tribunal should have considered, analyzed, and expressed its views regarding the Award in Orazul v. Argentina, on which the parties made extensive submissions.

[37] *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award of January 6 1988 of December 14 1989, ¶ 5.08.

[38] ICSID Convention, Art. 48(3) ("The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.").

[39] *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *Ad Hoc* Committee on the Application for Annulment of Mr. Soufraki's of June 5, 2007, ¶¶ 122–126; Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador, ICSID Case No. ARB/06/11, Decision on Annulment of the Award of November 2, 2015, ¶ 65.

[40] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated December 8, 2000 of February 5 2002, ¶ 101.

47. First, the Tribunal applied the same conclusions to different facts or measures without stating why it was appropriate to replicate those conclusions in different circumstances. For example, in finding that FONINVEMEM[41] II and III were arbitrary, the Tribunal merely generalized that "[i]n light of the above, the Tribunal determines that the new cost-plus system and the prohibition of PPAs established by Argentina are also arbitrary [measures]."[42] However, that conclusion disregards the extensive evidence in the record showing the voluntary nature of those agreements and the benefits they entailed for AES. The Tribunal even acknowledges that there are substantial factual differences between the original program and FONINVEMEM II and III.[43] Thus, "there is a significant lacuna in the Award, which makes it impossible for the reader to follow the reasoning on this point";[44] consequently, there is a failure to state the reasons on which its conclusions are based.

48. Second, the Tribunal failed to state reasons concerning arguments that were fundamental to the determination of *quantum*. For example, the Tribunal ignored a set of highly relevant arguments concerning the difference between AES's 2003 valuation model and the updated model submitted in 2020, which demonstrates that AES suffered no damages as a result of the measures. Indeed, AES achieved a better performance than AES had expected in 2003 to achieve in a scenario without the measures.[45] The Tribunal reduced Argentina's line of argument to the proposition that it had allegedly argued that the earning of profits demonstrated the absence of damages, when that was not Argentina's argument.[46] Argentina's argument was that, in the actual scenario, AES achieved greater profitability than it had expected in 2003 to achieve in the future. In other words, this Tribunal had before it unique evidence in the form of the but-for scenario constructed by AES in 2003,

---

[41] One indication that the Tribunal disregarded evidence demonstrating that difference is that, in its factual background, it includes no reference whatsoever to FONINVEMEM II and III. *See* Award, § III.6.

[42] Award, ¶ 348; *see also* Award, ¶ 331 ("In the Tribunal's view, FONINVEMEM II and FONINVEMEM III are of the same nature as FONINVEMEM I").

[43] Award, ¶ 330.

[44] *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *Ad Hoc* Committee on the Application for Annulment of the Argentine Republic of September 25 2007, ¶ 97.

[45] *See, e.g.*, Updated Counter-Memorial, § VII.D.2.a.

[46] Award, ¶ 478; *see also* Award, ¶ 489.

which made it possible to see how AES expected the future to unfold in a scenario without the measures. What ultimately happened was that, in 2020, when AES's actual historical performance was examined retrospectively, reality exceeded what it had expected in 2003. By disregarding that evidence and argument, it is impossible to understand the conclusion concerning the alleged existence of damages suffered by AES.

49. Likewise, in deciding the discount rate to be applied for "uncertainty" to the compensation claimed by AES,[47] the Tribunal provided no reasons for selecting a particular factor (1.25%), nor did it identify the source of that percentage—which neither party had proposed.[48]

50. Additionally, with respect to the assessment of the alleged damages and their causal link with the challenged measures, the Tribunal ignored the fact that AES did not submit a single contemporaneous document to the record mentioning that it had suffered the damages it claimed in this arbitration.[49] Likewise, it completely ignored the overwhelming documentary evidence derived from the audited financial statements of AES's generators, the documentation submitted by Claimant itself to the United States Securities and Exchange Commission, and statements by AES's highest-ranking global officers highlighting the quality of its investments in Argentina and the amount of profits obtained.[50]

### IV.C.2. The Award Contains Contradictory Reasoning

51. On several occasions, the Tribunal engaged in contradictory reasoning, warranting the annulment of the Award.[51]

---

[47] Award, ¶¶ 542–548.

[48] Award, ¶ 548.

[49] Argentina's Post-Hearing Brief on the Merits, ¶ 249.

[50] Updated Counter-Memorial, ¶¶ 371, 381, 468–469; Rejoinder, ¶¶ 431, 515, 522; Argentina's Post-Hearing Brief on the Merits, ¶¶ 5, 248.

[51] *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited of July 3 2013, ¶ 45; *See also Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award of January 6 1988 of December 14 1989 ¶ 5.09; *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, Decision on the

52. First, the Tribunal also falls into a serious contradiction by treating AES and the generators as a single entity for certain purposes, while distinguishing between them for others. Thus, when analyzing the waivers and the arguments concerning consent, estoppel, and acquiescence, the Tribunal emphasizes the separate legal personalities of AES and its generators in order to conclude that AES's claims were admissible because the waivers made by its generators did not constitute a waiver by AES itself.[52] According to the Tribunal, "[t]he entities that assumed compromises with respect to the construction, operation and maintenance of certain power plants or that accepted to be involved, in accordance with the evidence presented by the Respondent, were AES Argentina Generación S.A, AES Alicurá S.A, AES Juramento, C.T AES Paraná, Hidrotérmica San Juan S.A and Central Térmica San Nicolás S.A. The Tribunal thus understands that compliance of those compromises was required from these companies or overall from AES Argentina Generación, S.A., not from the Claimant."[53] However, on multiple occasions, the Tribunal emphasized the effect that the measure allegedly had on the generators' revenues, equating those effects with measures affecting AES. For example, with respect to Resolution No. 95/2013, the Tribunal stated that: "[p]rior to accepting this Resolution, Claimant's situation was difficult, and a bankruptcy risk existed […] [c]laimant's revenues and profits were restrained, which in turn restrained at least its management and operation."[54] It continued: "AES continued to subsidize smaller plants to avert their bankruptcy and was restricted as to its fuel procurement, a key element in electricity generation."[55] Even in the Decision on Jurisdiction, the Tribunal held that the generators were not only owned by AES, but were also controlled by it.[56] In light of the foregoing, if AES controls the generators, their conduct has an impact on AES. If, on the other hand, it

Application for Annulment Submitted by Klöckner Against the Arbitral Award Rendered on October 21, 1983 of May 3 1985, ¶ 116.

[52] *See* Award, ¶¶ 161, 171–172.

[53] Award, ¶ 161.

[54] Award, ¶ 401; *see also* Decision on Jurisdiction, ¶ 91 ("[…]contracts and related documents pertaining to some entities (EDES, EDELAP, Alicura and Hidroelectrica San Juan) but to none of the other AES Entities.").

[55] Award, ¶ 401; *see also* Decision on Jurisdiction, ¶ 93.

[56] Decision on Jurisdiction, ¶ 84.

is maintained that the generators' conduct has no impact on AES, it cannot then be maintained that AES controls them.

53. The Tribunal also contradicts itself when analyzing the text of the agreements. While it acknowledges that the wording of the waivers establishes that the waiver encompasses "all actions and/or claims," it simultaneously questions the fact that the agreements do not specify what is being waived.[57] However, if the agreements constituted a waiver of all claims, it was unnecessary to list them individually because the waiver encompassed all of them, leaving none excluded.

54. Second, there were irreconcilable contradictions concerning interest. For example, on the one hand, the Tribunal determined that "a risk-free interest rate […] would be appropriate to achieve full reparation,"[58] but, at the same time, it contradicted itself by deciding that the time value of the generators' withheld revenues would be compensated at AES's weighted average cost of capital rate (WACC), which includes risk.[59] Even more seriously, in making that determination, it did not explain why the Tribunal stated that Argentina had failed to indicate what interest rate should apply to those withheld revenues[60] when, in fact, Argentina explained in detail why the risk-free rate should always apply.[61] Indeed, the Tribunal states that "Respondent's silence in this regard fails to contest the reasonability of Claimant's proposed methodology[…]."[62] Moreover, the Tribunal did not provide an economic and legal explanation as to why that rate should apply and why it applied it in this particular instance.[63] Accordingly, the Tribunal falls into a serious contradiction by finding that a risk-free rate is applicable while simultaneously applying a rate that includes risk.

---

[57] Award, ¶ 163.

[58] Award, ¶ 573.

[59] Award, ¶ 556.

[60] Award, ¶ 565.

[61] *See, e.g.,* Updated Counter-Memorial, ¶¶ 884–894.

[62] Award, ¶ 555.

[63] Award, ¶ 565.

55. Third, as explained above in relation to the model prepared by Quantum América, the Tribunal's determination of damages essentially means that it accepted absolutely all the assumptions of the model submitted by AES, since the model had to be accepted in its entirety or rejected; it could not be corrected or modified. This meant that the Tribunal also had to use that model's valuation date.[64] This led it into a contradiction because the Tribunal determined that it would use the date of the Award as the valuation date,[65] stating that "it would not only be a mistake, but it would also go against any logic to establish an earlier date for purposes of valuing damages arising from a set of measures that continued to materialize and to cause damages for several years (and continue still)."[66] However, without invoking any basis or reason whatsoever, the Tribunal did not calculate damages as of the date of the Award, but rather as of December 31, 2020, almost five years before the date of the Award.[67]

56. In proceeding in this manner, the Award's calculation of damages does not take into account fundamental elements that would have reduced the damages, such as assigning value to the equity interests that AES received in the plants constructed under the FONINVEMEM program,[68] or the fact that the concession for the Alicurá plant ended in August 2023,[69] notwithstanding which AES continues to operate it to this day.

### IV.C.3. The Award Includes Frivolous Reasoning Equivalent to an Absence of Reasons

57. The Award provided frivolous reasoning equivalent to an absence of reasons.[70]

58. First, with respect to the existence of a causal nexus between the challenged measures and the damages suffered, the Tribunal merely states that "[i]n the case at hand, the harm to the Claimant's profit margin was caused by the regulatory environment created by the

[64] *Infra*, § IV.B.

[65] Award, ¶ 439.

[66] Award, ¶ 441.

[67] Award, ¶¶ 548, 556 and 602(ix).

[68] Award, ¶¶ 550–552; Counter-Memorial, ¶ 847; Rejoinder, ¶¶ 986, 992, 994.

[69] Award, ¶ 85.

[70] Maritime International Nominees Establishment v. Republic of Guinea, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award of 6 January 1988 of December 14 1989, ¶ 5.09.

Respondent's measures.,"[71] generically mentioning that "[t]he measures included those on spot price formation and dispatch, the exclusions on non-natural gas plants as well as the spot price cap that by 2013 placed the Claimant in a critical situation,"[72] and limiting itself to providing two additional brief examples of those measures.[73] With this generic statement, devoid of any analysis whatsoever, the Tribunal concluded that there was a sufficient causal nexus to attribute international responsibility.

59. Second, the Tribunal also addresses the but-for scenario frivolously.[74] For example, it concluded that AES's projections regarding gas exports were entirely correct simply because it considered Argentina's projections to be incorrect.[75] In connection with that conclusion, the Tribunal did not address, consider, or make any reference whatsoever to Argentina's criticisms of AES's but-for scenario. In a manner identical to the failure to state reasons identified by the committee in *TECO v. Guatemala*, the Tribunal merely mentioned the different values calculated by the parties' experts for the two scenarios and concluded that there was no "sufficient basis"[76] with respect to one of them. This is an example of how the Tribunal reaches its conclusions by ignoring relevant facts, evidence, and arguments submitted by the parties that were decisive for the resolution of the case, through superficial, cursory, and frivolous references that entail excessive simplifications or generalizations of the parties' submissions or of the disputed issues in the case, which is equivalent to failing to state the reasons on which it relies in reaching its conclusions.

60. Third, in deciding whether or not the FONINVEMEM program was an arbitrary measure, the Tribunal relies on its conclusions regarding other measures that had nothing to do with FONINVEMEM. Thus, the Tribunal concludes that FONINVEMEM constituted an

---

[71] Award, ¶ 465.

[72] Award, ¶ 465.

[73] Award, ¶ 466.

[74] Award, ¶ 529.

[75] Award, ¶ 529.

[76] *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment of April 5, 2016, ¶ 130 ("The Tribunal simply limited itself to mentioning the differing values which the Parties' experts calculated for the two scenarios and concluding that there was '**no sufficient evidence**'") (emphasis added); Award, ¶ 529 ("The Tribunal does not consider that the excerpt pointed at by the Respondent constitutes **enough foundation** for the assumption that exports would be limited. In the Tribunal's view, the forecasts presented by the Claimant as well as the trend of exports are reasonable.") (emphasis added).

arbitrary measure because other measures—caps on the spot price, exclusion of certain generating units from spot price formation, and capacity prices—unrelated to FONINVEMEM were arbitrary.[77]

## V. STAY OF ENFORCEMENT OF THE AWARD

61. Pursuant to Article 52(5) of the ICSID Convention, the Argentine Republic requests that enforcement of the Award in its entirety be stayed while the Application for Annulment remains pending. Likewise, pursuant to Article 52(5) of the ICSID Convention and Arbitration Rule 54(1), the Secretary-General is requested to notify the parties of the provisional stay of enforcement of the Award.

## VI. REQUEST FOR RELIEF

62. In light of the foregoing, the Argentine Republic requests that:

(a) the Award, of which the Decision on Jurisdiction forms part, be annulled pursuant to Article 52 of the ICSID Convention and Arbitration Rule 50;

(b) enforcement of the Award be stayed until the *ad hoc* Committee decides on its annulment, pursuant to Article 52 of the ICSID Convention and Arbitration Rule 54

(c) the Secretary-General notify the parties of the provisional stay of enforcement of the Award pursuant to Article 52 of the ICSID Convention and Arbitration Rule 54; and

(d) Claimant pay all expenses and costs arising from this proceeding.

Respectfully submitted on September 26, 2025.

[There appear three illegible signatures.]

| [SIGNATURE] | [SIGNATURE] | [SIGNATURE] |
|---|---|---|
| Mag. Santiago M. Castro Videla, Procurador del Tesoro de la Nación [Treasury Attorney General]. | Dr. Julio Pablo Comadira, Subprocurador del Tesoro de la Nación [Deputy Treasury Attorney General]. | Mag. Juan Ignacio Stampalija, Subprocurador del Tesoro de la Nación [Deputy Treasury Attorney General]. |

[77] Award, ¶ 334.

**THIS IS A TRUE AND ACCURATE TRANSLATION** into English, in twenty-one pages, of the attached document in Spanish, which I had before me. Digitally signed in the City of Buenos Aires, Argentina, on July 14, 2026.

[For certification purposes only:]

ES TRADUCCIÓN FIEL al idioma inglés, en veintiún páginas, del documento adjunto en idioma español que he tenido a la vista y al cual me remito. Firmada digitalmente en la Ciudad de Buenos Aires, Argentina, a los 14 días del mes de julio de 2026.

Juan Manuel Falabella
Sworn Translator English Language

Registered at the Buenos Aires Sworn Translators' Association (Registration No. 7210, Volume XIX, Page 082)

CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES

---

**AES Corporation**

Demandante

**c.**

**República Argentina**

Demandada

---

**Caso CIADI Nº ARB/02/17**

# SOLICITUD DE LA REPÚBLICA ARGENTINA DE ANULACIÓN Y DE SUSPENSIÓN DE LA EJECUCIÓN DEL LAUDO

26 de septiembre de 2025

**PROCURACIÓN DEL TESORO DE LA NACIÓN**
Posadas 1641
C1112ADC Buenos Aires
República Argentina

**TABLA DE CONTENIDOS**

I. OBJETO ........ 1
II. ANTECEDENTES PROCESALES ........ 2
III. ANTECEDENTES RELEVANTES DE LA CONTROVERSIA ........ 4
IV. FUNDAMENTOS DE LA REPÚBLICA ARGENTINA PARA LA ANULACIÓN DEL LAUDO ........ 6
IV.A. El Tribunal se extralimitó manifiestamente en sus facultades ........ 7
IV.A.1. El Tribunal se excedió en su jurisdicción ........ 8
IV.A.2. El Tribunal no aplicó el derecho aplicable a la controversia ........ 9
IV.B. El Tribunal quebrantó gravemente normas fundamentales de procedimiento ........ 9
IV.C. El Laudo no expresa los motivos en los que se funda ........ 13
IV.C.1. El Laudo omitió expresar razones para las conclusiones a las que arribó ... 13
IV.C.2. El Laudo contiene razonamientos contradictorios ........ 15
IV.C.3. El Laudo incluye razonamientos frívolos que equivalen a una ausencia de motivos ........ 18
V. SUSPENSIÓN DE LA EJECUCIÓN DEL LAUDO ........ 19
VI. PETITORIO ........ 20

## GLOSARIO DE TÉRMINOS

| | |
|---|---|
| **§(§)** | sección(es) |
| **¶(¶)** | párrafo(s) |
| **AES** | AES Corporation |
| **Acuerdo 2008-2011** | Acuerdo para la Gestión y Operación de Proyectos, Aumento de la Disponibilidad de Generación Térmica y Adaptación de la Remuneración de la Generación 2008-2011 suscripto el 25 de noviembre de 2010 |
| **Acuerdo Definitivo** | Acuerdo Definitivo para la Gestión y Operación de los Proyectos para la Readaptación del Mercado Eléctrico Mayorista suscripto el 17 de octubre de 2005 |
| **Argentina** | República Argentina |
| **ARS** | Pesos argentinos |
| **art.** | artículo |
| **CAMMESA** | Compañía Administradora del Mercado Mayorista Eléctrico S.A. |
| **Centro / CIADI** | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| **Decisión sobre Jurisdicción** | Decisión sobre Jurisdicción del procedimiento arbitral caratulado *AES Corporation c. República Argentina* (Caso CIADI Nº ARB/02/17) del 26 de abril de 2005 |
| **Demandada** | República Argentina |
| **Demandante** | AES Corporation |
| **FONINVEMEM** | Fondo para Inversiones Necesarias que permitan incrementar la Oferta de Energía Eléctrica en el Mercado Eléctrico Mayorista |
| **Laudo** | Laudo del procedimiento arbitral caratulado *AES Corporation c. República Argentina* (Caso CIADI Nº ARB/02/17), comunicado a las partes el 30 de mayo de 2025 |
| **Ley de Electricidad** | Ley N° 24.065 |
| **Ley de Emergencia** | Ley N° 25.561 de Emergencia Pública y Reforma del Régimen Cambiario |
| **MEM** | Mercado Eléctrico Mayorista |
| **Regla(s) de Arbitraje** | Reglas procesales aplicables al procedimiento arbitral caratulado *AES Corporation c. República Argentina* (Caso CIADI Nº ARB/02/17), en vigor desde el 26 de septiembre de 1984. |
| **SE** | Secretaría de Energía |
| **Solicitud de Anulación** | Solicitud de Anulación y de Suspensión de la Ejecución del Laudo presentada por la República Argentina el 26 de septiembre de 2025 |

| | |
|---|---|
| **TBI Argentina-EE.UU.** o **TBI** | Tratado entre la República Argentina y los Estados Unidos de América sobre Promoción y Protección Recíproca de Inversiones, firmado el 14 de noviembre de 1991 y en vigor desde el 20 de octubre de 1994 |
| **USD** | Dólares estadounidenses |
| **WACC** | Costo medio ponderado del capital |

# SOLICITUD DE LA REPÚBLICA ARGENTINA DE ANULACIÓN Y DE SUSPENSIÓN DE LA EJECUCIÓN DEL LAUDO

La República Argentina (en adelante, "**Argentina**" o "**Demandada**") respetuosamente presenta esta Solicitud de Anulación y de Suspensión de la Ejecución del Laudo (en adelante, "**Solicitud de Anulación**") en el caso *AES Corporation c. República Argentina* (Caso CIADI Nº ARB/02/17).

## I. OBJETO

1. De conformidad con el artículo 52 del Convenio CIADI y la Regla de Arbitraje 50 de las Reglas de Arbitraje CIADI de 1986, la República Argentina solicita la anulación del Laudo del 30 de mayo de 2025 (en adelante, "**Laudo**"), del que forma parte la Decisión sobre Jurisdicción del 26 de abril de 2005 (en adelante, "**Decisión sobre Jurisdicción**").

2. Esta Solicitud de Anulación se presenta dentro de los 120 días desde la fecha de emisión del Laudo. La asignación de USD 25.000 (veinticinco mil dólares estadounidenses) por parte de la República Argentina en concepto de derecho de registro de la Solicitud de Anulación, conforme lo estipulan la Regla 16 (derecho de registro de las solicitudes) del Reglamento Administrativo y Financiero del Centro y los Aranceles de Derechos, Honorarios y Gastos en vigor desde el 1 de julio de 2023, ha sido confirmada por la Secretaría del CIADI.[1]

3. La presente Solicitud de Anulación está basada en las siguientes causales:

- el Tribunal se extralimitó manifiestamente en sus facultades (artículo 52(1)(b) del Convenio CIADI);
- el Tribunal quebrantó gravemente normas fundamentales de procedimiento (artículo 52(1)(d) del Convenio CIADI); y
- el Laudo omitió expresar los motivos en los que se funda (artículo 52(1)(e) del Convenio CIADI).

4. Asimismo, de conformidad con el artículo 52(5) del Convenio CIADI y la Regla de Arbitraje 54(1), la República Argentina solicita la suspensión de la ejecución del Laudo hasta que se

[1] El 11 de septiembre de 2025, mediante correo electrónico, la Secretaría del CIADI confirmó que el 12 de septiembre de 2025 se asignarían los fondos por el monto de USD 25.000, correspondiente al derecho de registro de la Solicitud de Anulación del presente caso. El 23 de septiembre de 2025, también por correo electrónico, la Secretaría confirmó que la transferencia interna de los fondos se había hecho efectiva el 12 de septiembre de 2025.

decida la presente Solicitud de Anulación.

## II. ANTECEDENTES PROCESALES

5. El procedimiento arbitral se inició con la presentación de la Solicitud de Arbitraje presentada por AES Corporation ("**AES**" o "**Demandante**"), compañía constituida en el Estado de Delaware, Estados Unidos de América, el 5 de noviembre de 2002. La Solicitud de Arbitraje fue registrada por el Secretario General del CIADI el 19 de diciembre de 2002.

6. El 3 de junio de 2003 se constituyó el Tribunal, compuesto por el Profesor Karl-Heinz Böckstiegel —nacional de la República Federal de Alemania y designado por la Demandante—, el Profesor Domingo Bello Janeiro —nacional del Reino de España y designado por Argentina— y el Profesor Dr. Pierre-Marie Dupuy —Presidente del Tribunal, nacional de la República de Francia, y elegido por el Secretario General del CIADI, siguiendo a lo acordado por las partes—.

7. La Demandante presentó su Memorial sobre el Fondo el 7 de octubre de 2003. El reclamo de AES se refería a una serie de medidas que habrían impactado en su inversión, definida como aquella participación directa o indirecta en ocho empresas de generación de energía eléctrica[2] y tres empresas de distribución[3] de electricidad en Argentina. El reclamo se encontraba enmarcado en el Tratado sobre Promoción y Protección Recíproca de Inversiones entre la República Argentina y los Estados Unidos de América (en adelante, "**TBI Argentina-EE.UU.**" o "**TBI**").

8. En términos generales, la Demandante reclamaba por los efectos de la Ley N° 25.561 de Emergencia Pública y Reforma del Régimen Cambiario (en adelante, "**Ley de Emergencia**") y la ruptura de la paridad entre el peso y el dólar respecto de sus activos en el sector de distribución y una serie de medidas adoptadas por la Secretaría de Energía ("**SE**") que según se alegó tergiversaban los principios básicos del Mercado Eléctrico Mayorista (en adelante, "**MEM**") regulado por la Ley N° 24.065 (en adelante, "**Ley de Electricidad**"). Asimismo, AES reclamaba por las medidas adoptadas por la SE durante

---

[2] Central Térmica San Nicolás, Central Hidroeléctrica Cabra Corral, Central Hidroeléctrica El Tunal, Central Hidroeléctrica Ullum, Central Térmica Central Sarmiento, Central Térmica Paraná, Hidroeléctrica Alicurá, Central TermoAndes.

[3] Empresa Distribuidora La Plata S.A. ("EDELAP"), Empresa Distribuidora de Energía Norte S.A. ("EDEN"), y Empresa Distribuidora de Energía Sur S.A. ("EDES").

2002 y 2003 que modificaban el régimen regulatorio para hacer frente a la crisis.[4] AES alegó que tales medidas supuestamente violaban los estándares de trato justo y equitativo, entera protección y seguridad, trato no menos favorable que el exigido por el derecho internacional, protección contra medidas arbitrarias o discriminatorias, cumplimiento de compromisos contraídos con respecto a las inversiones y protección en relación con la expropiación previstos en el TBI Argentina-EE.UU..

9. El 31 de diciembre de 2003, Argentina presentó su Memorial de Excepciones a la Jurisdicción. El 18 de febrero de 2004 el Tribunal dispuso la bifurcación del procedimiento. La Demandante presentó su Memorial de Contestación sobre Jurisdicción el 20 de febrero de 2004, Argentina presentó su Memorial de Réplica sobre Jurisdicción el 26 de marzo de 2004, y la Demandante presentó su Memorial de Dúplica sobre Jurisdicción el 26 de abril de 2004. El 23 y 24 de octubre de 2004 se celebró una audiencia sobre jurisdicción. El Tribunal emitió la Decisión sobre Jurisdicción el 26 de abril de 2005, rechazando las excepciones planteadas por Argentina.

10. El 8 de septiembre de 2005, Argentina presentó su Memorial de Contestación sobre el Fondo.

11. En diciembre de 2005, con motivo de la renegociación de los contratos de concesión de distribución y del proceso de revisión tarifaria, sumado a la convocatoria de la SE a los generadores interesados en participar del programa del Fondo para Inversiones Necesarias que permitan incrementar la Oferta de Energía Eléctrica en el Mercado Eléctrico Mayorista (en adelante, "**FONINVEMEM**"), las partes acordaron la suspensión del procedimiento arbitral. Dicha suspensión fue prorrogada cada seis meses durante más de 13 años (entre el 23 de enero de 2006 y el 11 de diciembre de 2018). El objetivo de la suspensión era intentar llegar a una solución amigable de la controversia. Como lo reconoce el Tribunal, el pedido de suspensión "refers expressly to the Adhesion Act approved by Resolution SE No. 1427/2004 and the Definitive Agreement approved by Resolution No. 1193/2005".[5] Sin embargo, a pesar de que dichos acuerdos se estaban cumpliendo, el 11 de diciembre de 2018 la Demandante manifestó su voluntad de reiniciar el procedimiento.

12. El procedimiento fue reanudado el 11 de enero de 2019 a pedido de la Demandante.

---

[4] Demanda Original, ¶ 53.

[5] Laudo, ¶ 133.

13. El 27 y 28 de enero de 2019, respectivamente, los Profesores Dupuy y Böckstiegel comunicaron su renuncia al Tribunal Arbitral. El 7 de julio de 2019, el Sr. Stephen L. Drymer —de nacionalidad canadiense— aceptó su designación como árbitro, nombrado por la Demandante. El 2 de diciembre de 2019, el Presidente del Consejo Administrativo del CIADI nombró al Profesor Ricardo Ramírez Hernández —de nacionalidad mexicana— como Presidente del Tribunal Arbitral. El Tribunal Arbitral quedó reconstituido el 12 de diciembre de 2019.

14. El 24 de abril de 2020, la Demandante presentó su Memorial de Demanda Actualizado. El nuevo reclamo cambió respecto de la demanda original en tanto en la Demanda Actualizada AES: (i) desistió de todos los reclamos por su participación en las sociedades distribuidoras de energía (EDEN, EDES y EDELAP), y en la sociedad generadora Central Dique; (ii) retiró sus reclamos por la alegada expropiación y bajo la cláusula paraguas; y (iii) modificó completamente el método valuatorio. Sin embargo, el monto total reclamado se incrementó considerablemente. AES reclamó USD 1.814 millones, en contraste con los USD 154 millones que había reclamado en 2003, de los cuales el 73% correspondía a su inversión en el sector de distribución de energía eléctrica, lo cual ya no formaba parte del reclamo del año 2020.

15. Argentina presentó un Memorial de Contestación Actualizado, el 22 de octubre de 2020. La Demandante presentó su Memorial de Réplica el 26 de marzo de 2021, y Argentina presentó su Memorial de Dúplica el 30 de julio de 2021.

16. La audiencia sobre el fondo se llevó a cabo entre el 6 y 16 de febrero de 2023, en la sede del CIADI de la ciudad de Washington DC. El 23 de junio de 2023, las partes presentaron sus Escritos Posteriores a la Audiencia. El 2 de mayo de 2024, las partes presentaron sus escritos sobre costos actualizados.

17. El 12 de mayo de 2025, el Tribunal declaró cerrado el procedimiento. El 30 de mayo de 2025 el Tribunal emitió el Laudo.

## III. Antecedentes Relevantes de la Controversia

18. La disputa se refiere a medidas en el sector de generación de energía eléctrica en la República

Argentina.[6] El marco regulatorio de dicho sector se basa en la Ley de Electricidad, que consideró la actividad de generación eléctrica como de interés general,[7] delegando en la SE amplias facultades para regular el MEM.[8] Por su parte, el Decreto N° 1192/92 creó la Compañía Administradora del Mercado Mayorista Eléctrico S.A. (en adelante, "**CAMMESA**"), encargada de la administración del MEM.[9] CAMMESA es una sociedad anónima argentina en la cual el Estado Nacional solo tiene el 20% de las acciones. El 80% restante se distribuye por partes iguales entre la Asociación de Generadores de Energía Eléctrica, la Asociación de Distribuidores de Energía Eléctrica, la Asociación de Transportistas de Energía Eléctrica y la Asociación de Grandes Usuarios de Energía Eléctrica.[10]

19. A mediados de 1998, una serie de shocks externos afectaron la economía argentina, dando lugar a una recesión prolongada que culminó, a fines de 2001, en el colapso del régimen de Convertibilidad y en la crisis más grave en la historia argentina, considerada también entre las más severas a nivel global. Dicha crisis tuvo naturaleza económica, financiera, cambiaria, social y política.

20. Para hacer frente a la crisis, Argentina adoptó diversas medidas. En enero de 2002, el Congreso declaró la emergencia pública en materia social, económica, administrativa, financiera y cambiaria, sancionando la Ley de Emergencia.[11] Esta ley, entre otras cuestiones, puso fin formalmente a la paridad cambiaria entre el peso y el dólar estadounidense. Pocos días después de la sanción de la Ley de Emergencia, el Poder Ejecutivo de la República Argentina dispuso la conversión a pesos de todas las obligaciones de dar sumas de dinero, de cualquier causa u origen expresadas en dólares, u otras monedas extranjeras, existentes al momento de la sanción de la Ley de Emergencia y que no se encontrasen ya convertidas a pesos.[12]

21. Asimismo, la SE debió adecuar las regulaciones del sector eléctrico al nuevo escenario y

---

[6] Si bien originalmente había incluido un reclamo relativo a medidas en el sector de distribución de energía eléctrica, AES desistió de ese reclamo el 9 de agosto de 2006 y el 14 de noviembre de 2011.

[7] Ley N° 24.065, 19 de diciembre de 1991, art. 1.

[8] Ley N° 24.065, 19 de diciembre de 1991, arts. 35 y 36.

[9] Decreto N° 1.192/1992, 21 de julio de 1992, art. 1.

[10] Decreto N° 1.192/1992, 21 de julio de 1992, art. 3.

[11] Ley N° 25.561, 6 de enero de 2002, arts. 2, 3.

[12] Decreto N° 214/02, 3 de febrero de 2002, art. 1.

realizar los ajustes necesarios para privilegiar la operatividad del sistema en el corto plazo y priorizar el reconocimiento de los costos operativos en que incurrían los agentes generadores. Entre las medidas adoptadas: (i) se homogeneizaron las unidades monetarias de la regulación del sector eléctrico, (ii) se modificó el cálculo del precio spot y se adoptaron medidas para asegurar que los generadores recuperen sus costos operativos, (iii) se crearon incentivos para asegurar la disponibilidad de generadores térmicos y se financiaron mantenimientos, (iv) se aumentaron los pagos por potencia y se desvinculó a estos del despacho real para incentivar la disponibilidad de generadores térmicos, y (v) se crearon nuevas remuneraciones para las reservas de disponibilidad de potencia con garantía de combustible y de confiabilidad para asegurar la prestación del servicio eléctrico.

22. Con posterioridad al inicio del arbitraje, las partes iniciaron negociaciones transaccionales que conllevaron la suspensión del presente proceso arbitral por más de 13 años y a la celebración de sucesivos acuerdos en virtud de los cuales se resolvieron las diferencias entre las partes. En efecto, en diciembre de 2005, con motivo de la renegociación de los contratos de concesión de distribución y proceso de revisión tarifaria, sumado a la convocatoria de la Secretaría de Energía a los generadores interesados en participar del programa del FONINVEMEM, las partes acordaron la suspensión del procedimiento arbitral. Dicha suspensión fue prorrogada cada seis meses durante más de 13 años hasta que, a fines de 2018, la Demandante notificó a Argentina su intención de reanudar el procedimiento.

23. Los generadores, liderados por AES, celebraron acuerdos con Argentina, entre ellos: el Acuerdo Definitivo para la Gestión y Operación de los Proyectos para la Readaptación del Mercado Eléctrico Mayorista suscripto en 2005 (en adelante, "**Acuerdo Definitivo**") y el Acuerdo para la Gestión y Operación de Proyectos, Aumento de la Disponibilidad de Generación Térmica y Adaptación de la Remuneración de la Generación 2008-2011 suscripto en 2010 (en adelante, "**Acuerdo 2008-2011**"), así como su expresa aceptación al régimen de remuneración previsto en la Resolución SE Nº 95/13.

## IV. FUNDAMENTOS DE LA REPÚBLICA ARGENTINA PARA LA ANULACIÓN DEL LAUDO

24. El artículo 52(1) del Convenio CIADI establece las causales que motivan la anulación de un laudo arbitral: (a) incorrecta constitución del Tribunal, (b) extralimitación manifiesta en las facultades del Tribunal, (c) corrupción por parte de un miembro del Tribunal, (d) quebrantamiento grave de una norma fundamental de procedimiento, y (e) falta de expresión de las razones en las que se funda el laudo. El mismo artículo dispone que las partes pueden

alegar la existencia de uno o más de estos motivos, e incluso permite invocar más de uno de ellos en relación con un mismo aspecto del laudo.[13]

25. En la presente Solicitud de Anulación, Argentina sostiene que el Laudo adolece de vicios que se enmarcan en las causales previstas en los incisos (b), (d) y (e) del artículo 52(1) del Convenio CIADI.[14]

### IV.A. El Tribunal se extralimitó manifiestamente en sus facultades

26. Los comités *ad hoc* han sostenido de manera consistente que un tribunal incurre en un exceso de sus facultades cuando excede el ejercicio de la jurisdicción conferida a él por las partes de una controversia, incluyendo los parámetros jurisdiccionales, el derecho aplicable y las cuestiones planteadas por las partes.[15] Esta causal de anulación se configura tanto cuando un tribunal asume poderes que no tiene, como cuando no ejerce las potestades que sí tiene.[16]

27. En cuanto a los parámetros jurisdiccionales, los tribunales pueden incurrir en una extralimitación de sus facultades al resolver sobre una parte de la controversia careciendo de jurisdicción para hacerlo o excediendo el ámbito de su competencia, así como también al no ejercer la jurisdicción que legítima y efectivamente les fue dada.[17] También se ha entendido que incurren en una extralimitación de sus facultades los tribunales arbitrales que deciden sobre cuestiones que no son alcanzadas por el ámbito del caso, es decir, cuando se configura un *exceso* de jurisdicción.[18] Es decir, comete una extralimitación en sus facultades si ejerce

---

[13] *Togo Electricité y GDF-Suez Energie Services c. República de Togo*, Caso CIADI N° ARB/06/07, Decisión sobre la Anulación del Laudo del 6 de septiembre de 2011, ¶ 52.

[14] Los pasajes del Laudo que se enuncian o citan a continuación, a modo ejemplificativo, son sólo algunos de los varios que ilustran los fundamentos de las causales de anulación invocadas en esta Solicitud de Anulación. Las referencias exhaustivas al Laudo serán indicadas en detalle en la correspondiente etapa procesal.

[15] *Hussein Nuaman Soufraki c. Emiratos Árabes Unidos*, Caso CIADI N° ARB/02/7, Decisión del Comité *Ad Hoc* sobre la Solicitud de Anulación del Sr. Soufraki del 5 de junio de 2007, ¶¶ 42-45.

[16] *Ioan Micula, Viorel Micula y otros c. Rumania*, Caso CIADI N° ARB/05/20, Decisión sobre la Anulación del Laudo del 26 de febrero de 2016, ¶ 126; *Duke Energy International Peru Investments No. 1 Ltd. c. República de Perú*, Caso CIADI N° ARB/03/28, Decisión sobre la Anulación del Laudo del 1 de marzo de 2011, ¶ 97.

[17] *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. República del Ecuador*, Caso CIADI N° ARB/06/11, Decisión sobre la Anulación del Laudo del 2 de noviembre de 2015, ¶ 50.

[18] *Compañía de Aguas del Aconquija S.A. (anteriormente, Aguas del Aconquija) y Vivendi Universal S.A. (Anteriormente, Compagnie Générale des Eaux) c. República Argentina* (I), Caso CIADI N° ARB/97/3, Decisión de Anulación del 3 de julio del 2002, ¶ 86.

una jurisdicción que no posee.

28. Respecto de la omisión de tratar cuestiones planteadas por las partes, los comités *ad hoc* han interpretado que los tribunales arbitrales incurren en una extralimitación de sus facultades cuando se desentienden de asuntos cruciales o decisivos para la decisión.[19]

29. Asimismo, un Tribunal excede sus facultades cuando no aplica el derecho aplicable a la controversia. Para analizar si un tribunal ha fallado en la aplicación del derecho aplicable, es preciso identificar cuál es el derecho aplicable a la controversia, cuál ha sido el derecho aplicado por el tribunal y si hay razones para concluir que su decisión supuso un apartamiento del derecho aplicable.[20] Los comités *ad hoc* coinciden en que los árbitros pueden decidir solamente dentro de los límites establecidos por el consentimiento brindado por las partes respecto del derecho aplicable y en que, si el tribunal ignora de plano el derecho aplicable o basa sus conclusiones en un derecho diferente al aplicable de conformidad con el artículo 42 del Convenio CIADI, excede así manifiestamente el mandato recibido.[21]

30. En cualquiera de los casos, la extralimitación es manifiesta cuando es clara o fácilmente reconocible.[22] En este caso, el exceso de autoridad por parte del Tribunal no solo es manifiesto, sino también sustancial, lo que ha afectado gravemente los razonamientos y conclusiones expuestos por el Tribunal en el Laudo. La extralimitación es también múltiple, en tanto el Tribunal se excedió en el ejercicio de sus facultades en numerosas ocasiones.

### IV.A.1. El Tribunal se excedió en su jurisdicción

31. El Tribunal se extralimitó en sus facultades al asumir jurisdicción sobre una controversia que ya no existía. En efecto, la Demandante había renunciado, a través de sus subsidiarias, a reclamar por las medidas objeto del arbitraje. Esas renuncias fueron múltiples (en el Acuerdo Definitivo de 2005, el Acuerdo 2008-2011 y la Resolución SE 95/2013) y todas con posterioridad al inicio del procedimiento arbitral. De este modo, no cabía duda de que

---

[19] *Togo Electricité y GDF-Suez Energie Services c. República de Togo*, Caso CIADI N° ARB/06/07, Decisión sobre la Anulación del Laudo del 6 de septiembre de 2011, ¶ 57.

[20] *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. Chile*, Caso CIADI N° ARB/01/7, Decisión sobre la Anulación del Laudo del 21 de marzo de 2007, ¶ 59.

[21] *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. República de Ecuador*, Caso CIADI N° ARB/06/11, Decisión sobre la Anulación del Laudo del 2 de noviembre de 2015, ¶ 54.

[22] Documento actualizado de antecedentes sobre el mecanismo de anulación para el Consejo Administrativo del CIADI, 5 de mayo de 2016, ¶ 83.

al momento de reiniciar el procedimiento arbitral en 2019 la controversia se había extinguido y el Tribunal había perdido la jurisdicción sobre esos reclamos renunciados. En consecuencia, cuando el tribunal asume jurisdicción y decide sobre tales reclamos, llevó adelante un ejercicio de facultades *ultra petita* que amerita la anulación del Laudo.

### IV.A.2. El Tribunal no aplicó el derecho aplicable a la controversia

32. El Tribunal se excedió manifiestamente en sus facultades al omitir aplicar el derecho argentino, el TBI y el derecho internacional consuetudinario[23] al desconocer el derecho internacional en materia de daños. Si bien el Tribunal reconoció que debe existir una relación de causalidad entre las medidas impugnadas y el alegado daño,[24] y que los daños deben ser probados,[25] el Tribunal no aplicó esos principios. En efecto, no identificó qué medidas causaron qué daños y en qué momento. En cambio, se limitó a señalar que el hecho de que una medida sea violatoria del TBI implica que el daño se ha generado.[26]

## IV.B. El Tribunal quebrantó gravemente normas fundamentales de procedimiento

33. Para que se configure la causal de quebrantamiento grave de una norma fundamental de procedimiento, deben ser satisfechos los siguientes requisitos: (i) que la norma de procedimiento sea fundamental y (ii) que el Tribunal se haya apartado de ella de manera "grave". Es generalmente aceptado que el carácter fundamental de una norma de procedimiento se corresponde con un "set of minimal standards of procedure to be respected as a matter of international law".[27] Esto incluye, por ejemplo, el tratamiento equitativo de las partes, su derecho a ser oídas, el carácter independiente e imparcial del Tribunal, el apropiado tratamiento de la evidencia y la carga de la prueba.[28] En definitiva, esta causal de

---

[23] Los principios o normas consuetudinarias de derecho internacional aplicables son enumerados en la Disidencia sobre el Fondo, ¶ 380.

[24] Laudo, ¶¶ 447, 465.

[25] Laudo, ¶ 452.

[26] Laudo, ¶ 465.

[27] *Wena Hotels Limited c. República Árabe de Egipto*, Caso CIADI N° ARB/98/4, Decisión sobre la Solicitud de Anulación del 5 de febrero de 2002, ¶ 57.

[28] *Ver, por ejemplo*, Documento actualizado de antecedentes sobre el mecanismo de anulación para el Consejo Administrativo del CIADI, marzo de 2024, ¶ 105.

anulación "has a wide scope and includes principles of natural justice"[29] y, en definitiva, "has to do with procedural matters. Examples of fundamental rules of procedure that ad hoc committees have identified include equal treatment of parties, the right to be heard and treatment of evidence and burden of proof".[30]

34. Por su parte, la determinación de la gravedad del quebrantamiento invocado suele requerir la demostración del impacto que el quebrantamiento podría haber tenido en el laudo.[31] Esto no significa que deba probarse que el quebrantamiento fue determinante en el laudo emitido, sino que el debido cumplimiento de la norma infringida llevaría potencialmente a un resultado diferente.[32]

35. En el presente caso, el Tribunal se apartó gravemente de normas fundamentales de procedimiento al soslayar el respeto de los estándares mínimos de procedimiento conforme al derecho internacional (como el derecho a ser oído, el debido proceso, el trato igualitario entre las partes y las reglas de carga de la prueba), socavando así la integridad del proceso arbitral en su conjunto. Ello fue así no solo en relación con las cuestiones de fondo, sino también al analizar y determinar la cuestión relativa al reclamo de daños.

36. Primero, a pesar de los reiterados pedidos de Argentina, el Tribunal no le otorgó acceso a los fundamentos del modelo económico de la Demandante, esto es, al modelo de despacho sobre precios y evolución del mercado de gas elaborado por Quantum América a pedido de la Demandante. Dicho modelo sustentaba la totalidad de los daños relativos a medidas vinculadas con el despacho y precio reclamados de la Demandante. Al privar a Argentina de esa evidencia, su derecho de defensa se vio vulnerado.

37. Más todavía, el Tribunal se apoyó en dicho modelo luego de sostener que la Demandada no habría solicitado tener acceso a él. Ello es falso. La Demandada solicitó dicho modelo tanto en su Contestación Actualizada como en su Dúplica, allí explicó el fundamento de esos pedidos y las consecuencias que tenía si Argentina y el Tribunal no contaban con dicho

---

[29] Documento actualizado de antecedentes sobre el mecanismo de anulación para el Consejo Administrativo del CIADI, marzo de 2024, ¶ 104.

[30] *Rockhopper Italia S.P.A., Rockhopper Mediterranean LTD., y Rockhopper Exploration PLC c. República Italiana*, Caso CIADI Nº ARB/17/14, Decisión de Anulación del 2 de junio 2025, ¶ 222.

[31] *Víctor Pey Casado y Fundación Presidente Allende c. República de Chile*, Caso CIADI Nº ARB/98/2, Decisión sobre la Solicitud de Anulación de la República de Chile del 18 de diciembre de 2012, ¶ 78.

[32] *Wena Hotels Limited c. Arab República Árabe de Egipto*, Caso CIADI Nº ARB/98/4, Decisión sobre la Solicitud de Anulación del 5 de febrero de 2002, ¶ 58.

acceso y cómo esta circunstancia impedía comprender su funcionamiento, replicarlo y, en su caso, modificarlo a fin de correr escenarios alternativos. En consecuencia, apoyándose en un hecho falso, el Tribunal justifica que se basó en el modelo de Quantum América para calcular los daños, sin dar cuenta de los argumentos de Argentina que explicó la relevancia de tener acceso a dicho modelo.

38. Por otro lado, si bien el Tribunal admitió —correctamente— que "la carga de la prueba respecto al cálculo de los daños recae sobre la Demandante",[33] indicó que la actitud de Argentina de no presentar un modelo valuatorio alternativo había sido —como mínimo— poco útil, señalando que "recurrir a un modelo alternativo o comparativo que aborde la misma hipótesis podría haber proporcionado al Tribunal más elementos con los que valuar, comparar y contrastar la valuación de la Demandante".[34] En definitiva, el Tribunal invirtió la carga de la prueba al criticar que Argentina no haya presentado un modelo cuando, en realidad, era la Demandante quien debía probar los alegados daños y permitir que la evidencia que soportaba su cálculo fuera testada tanto por la Demandada como por el Tribunal.

39. De esta forma, para cuantificar los alegados daños, el Tribunal tenía dos opciones: (i) aceptar todos los parámetros propuestos por la Demandante o (ii) considerar que esta última incumplió su carga probatoria y desestimar su reclamo económico. En tanto la falta de acceso al modelo de despacho de Quantum América no permitía al Tribunal modificar ninguno de los parámetros de la cuantificación de AES, incluida la fecha de valuación, pues ello habría requerido volver a correr el modelo de despacho, que no obra en el expediente, la única solución posible que tenía el Tribunal, de acuerdo con las reglas del debido proceso, era la de considerar que la Demandante no había cumplido con su carga de la prueba.

40. En definitiva, la valuación y la cuantificación del daño reclamado se basan en un modelo de despacho que no ha podido ser testeado por la Demandada ni por el Tribunal, habiéndosele privado a la Demandada el derecho de acceder a ella. Ello configura un grave quebrantamiento de las normas de procedimiento.

41. Segundo, el Tribunal negó a la Demandada el derecho a interrogar testigos relevantes presentados por la Demandante, los Sres. Fernando Pujals y Eduardo Dutrey. El pedido de

---

[33] Laudo, ¶ 515.

[34] Laudo, ¶ 515.

la Argentina se basaba en que esos testigos eran cruciales para la resolución del caso, puesto que eran actores principales en el proceso de los acuerdos celebrados en el marco del FONINVEMEM, las renuncias que ellos contenían y el modo en que los generadores argentinos de AES manifestaban su conformidad con las medidas por las cuales AES reclamaba en el arbitraje. A pesar de los reiterados pedidos de Argentina por interrogarlos, el Tribunal no los convocó a la Audiencia, solo se limitó a instar a la Demandante a hacer sus mejores esfuerzos para que ambos testigos pudieran participar de la Audiencia.

42. El reclamo de la Demandante se basa en supuestas expectativas y en una presunta coacción al momento de suscribir los acuerdos con el Estado Nacional, así como de las renuncias relacionadas con dichos acuerdos. Sin embargo, ni el Tribunal ni Argentina tuvieron la oportunidad de interrogar a estos dos testigos claves vinculados directamente con los hechos alegados por la Demandante.

43. Aunque, tras las insistencias de Argentina, el Tribunal dispuso que la Demandante debía realizar sus mejores esfuerzos para garantizar la comparecencia de dichos testigos en la audiencia de fondo, lo cierto es que la Demandante mantuvo su negativa, y ninguno de ellos se presentó para ser contrainterrogado, ni siquiera en formato virtual. Ante el actuar de la Demandante, privando a Argentina y al Tribunal, lo que correspondía era que el Tribunal haga las correspondientes inferencias negativas. Sin embargo, no lo hizo, incurriendo así en un grave quebrantamiento de normas fundamentales del procedimiento relativas a las consecuencias que deben deducirse de la conducta de las partes cuando estas ocultan o privan al Tribunal y a la otra parte de evidencia fundamental en un procedimiento arbitral.

44. Esta circunstancia se suma al hecho de que en varias oportunidades el Tribunal omitió considerar la evidencia presentada por Argentina sin dar explicación para descartarla. Por ejemplo, al descartar la vasta evidencia que confirmaba la beneplacencia con que los generadores argentinos se vinculaban con el Estado Nacional, incluso congratulándose de lo que juntos (generadores y Estado Nacional) estaban logrando, o la evidencia que confirmaba que la propia Demandante en EE. UU. mostraba su inversión en Argentina como un caso rentable y en expansión. A pesar de toda esa evidencia, el Tribunal concluye que los generadores estaban "cautivos" de Argentina, lo cual los habría llevado a aceptar los acuerdos, y que por ello el programa FONINVEMEM es una medida arbitraria.[35] Similar conducta adoptó el Tribunal respecto del laudo en el caso *Orazul International España*

[35] *Ver* Laudo, ¶¶ 307-333.

*Holdings S.L. c. República Argentina* (Caso CIADI N° ARB/19/25), que decidió sobre exactamente los mismos hechos a los que se refería el reclamo de AES y sobre el cual las partes extensamente argumentaron. Las partes ampliamente se refirieron a esa decisión explicando por qué era o no aplicable al caso de AES. El Tribunal no hace referencia alguna al razonamiento y conclusiones de la decisión del tribunal en el caso Orazul c. Argentina. Ello constituye un quebrantamiento de la norma fundamental del procedimiento consagrada en el derecho a ser oído.[36]

## IV.C. El Laudo no expresa los motivos en los que se funda

45. El Laudo tampoco expresa los motivos en los que se funda al impedirle al lector seguir el razonamiento del Tribunal sobre cuestiones de hecho o de derecho relevantes para decidir la controversia.[37] Esta causal, que bajo el artículo 48(3) del Convenio CIADI[38] amerita la nulidad del Laudo, se configura, entre otras circunstancias, cuando se constata la ausencia parcial o total de razonamiento en un laudo o en parte de él, la utilización de razones contradictorias, insuficientes, inadecuadas o frívolas,[39] o bien la falta de tratamiento de y/o decisión sobre argumentos o pruebas presentados por las partes, que sean sustanciales para la solución de la controversia.[40]

### IV.C.1. El Laudo omitió expresar razones para las conclusiones a las que arribó

46. En múltiples ocasiones el Tribunal omitió expresar los motivos que fundamentan las

---

[36] Al mismo tiempo, constituye una contradicción con lo que este Tribunal decidió en la Decisión sobre Jurisdicción al sostener que "sería difícil negar que la dimensión institucional de los mecanismos de control previstos en el marco del Convenio del CIADI bien podría contribuir, a más largo plazo, al desarrollo de una posición jurídica común, o *jurisprudence constante*, para resolver arduas cuestiones de derecho debatidas en muchos casos, en tanto esas cuestiones coincidan en sus características sustanciales". Decisión sobre Jurisdicción, ¶ 33. En virtud de esa premisa, el Tribunal debió haber considerado, analizado y manifestado en relación con el Laudo en el caso Orazul c. Argentina, sobre el que las partes ampliamente se expidieron.

[37] *Maritime International Nominees Establishment c. República de Guinea*, Caso CIADI Nº ARB/84/4, Decisión de Anulación Parcial del Laudo del 22 de diciembre de 1989, ¶ 5.08.

[38] Convenio CIADI, art. 48(3) ("El laudo contendrá declaración sobre todas las pretensiones sometidas por las partes al Tribunal y será motivado").

[39] *Hussein Nuaman Soufraki c. Emiratos Árabes Unidos,* Caso CIADI N° ARB/02/7, Decisión del Comité *Ad Hoc* sobre la Solicitud de Anulación del Sr. Soufraki del 5 de junio de 2007, ¶¶ 122-126; *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. República del Ecuador*, Caso CIADI N° ARB/06/11, Decisión sobre la Anulación del Laudo del 2 de noviembre de 2015, ¶ 65.

[40] *Wena Hotels Limited c. República Árabe de Egipto*, Caso CIADI N° ARB/98/4, Decisión sobre la Solicitud de Anulación del 5 de febrero de 2002, ¶ 101.

conclusiones a las que arribó.

47. Primero, el Tribunal aplicó las mismas conclusiones a hechos o medidas distintas sin motivar por qué resultaba pertinente replicar dichas conclusiones a supuestos diferentes. Por ejemplo, al establecer que FONINVEMEM[41] II y III fueron arbitrarios, el Tribunal se limitó a generalizar que "[a] la luz de lo que antecede, el Tribunal determina que FONINVEMEM II y III, en tanto son los dos programas de inversión que siguieron a FONINVEMEM I, también constituyen medidas arbitrarias".[42] Sin embargo, esa conclusión deja de lado la vasta evidencia en el expediente que muestra el carácter voluntario de esos acuerdos y los beneficios que para AES ellos implicaron. Incluso, el Tribunal reconoce que existen diferencias sustanciales de hecho entre el programa original y los FONINVEMEM II y III.[43] Así, "el Laudo exhibe una omisión importante, que impide al lector seguir el razonamiento",[44] por consiguiente, existe una falta en la expresión de los motivos sobre los que se fundan sus conclusiones.

48. Segundo, el Tribunal omitió expresar motivos sobre argumentos primordiales para la determinación del *quantum*. Por ejemplo, el Tribunal ignoró un conjunto de argumentos de gran relevancia sobre la diferencia entre el modelo valuatorio de AES de 2003 y el modelo actualizado presentado en 2020, que demuestra que AES no sufrió daños como consecuencia de las medidas. En efecto, AES obtuvo un mejor rendimiento de lo que AES en 2003 esperaba obtener en un escenario sin medidas.[45] El Tribunal redujo la serie argumental de Argentina a que ella supuestamente habría alegado que la obtención de ganancias mostraba la ausencia de daños, cuando ese no fue el planteo.[46] El argumento de la Argentina era que AES en el escenario real obtuvo una mayor rentabilidad que la que en 2003 esperaba obtener en el futuro. Es decir, este Tribunal tuvo frente a sí una evidencia única al contar con el escenario contrafáctico construido por AES en 2003, en donde era posible ver cómo AES

[41] Una muestra de que el Tribunal dejó de lado evidencia que demuestra esa diferencia es que en el relato factico, no incluye referencia alguna a FONINVEMEM II y III. *Ver* Laudo, § III.6.

[42] Laudo, ¶ 348; *Ver también* Laudo, ¶ 331 ("A juicio del Tribunal, FONINVEMEM II y FONINVEMEM III son de la misma naturaleza que FONINVEMEM I").

[43] Laudo, ¶ 330.

[44] *CMS Gas Transmission Company c. La República Argentina*, Caso CIADI Nº ARB/01/8, Decisión sobre la Solicitud de Anulación del 25 de septiembre de 2007, ¶ 97.

[45] *Ver*, por ejemplo, Contestación Actualizada § VII.D.2.a.

[46] Laudo, ¶ 478; *Ver también* Laudo, ¶ 489.

esperaba que funcionara el futuro en un escenario sin medidas. Lo que terminó ocurriendo es que, en 2020, cuando se observa cuál fue la realidad de AES hacia atrás, la realidad superó lo que esperaba en 2003. Al descartar esa evidencia y argumento es imposible comprender la conclusión sobre la alegada existencia de daños sufridos por AES.

49. Asimismo, al decidir sobre la tasa de descuento a aplicar por "incertidumbre" a la indemnización reclamada por AES,[47] el Tribunal no brindó motivos por los que eligió cierto factor (del 1,25%), ni indicó la fuente de este porcentaje —que ninguna de las partes planteó—.[48]

50. Adicionalmente, en cuanto a la valoración sobre alegados daños y su relación causal con las medidas cuestionadas, el Tribunal ignoró el hecho de que AES no aportó al expediente ni un solo documento contemporáneo en el que mencione haber sufrido los daños que reclamaba en este arbitraje.[49] Asimismo, también ignoró por completo la abrumadora prueba documental proveniente de los estados contables auditados de los generadores de AES, de la documentación presentada por la propia Demandante ante la *Securities and Exchange Commission* de Estados Unidos y las declaraciones de los más altos funcionarios de AES a nivel global destacando la calidad de sus inversiones en Argentina y la cuantía de las ganancias obtenidas.[50]

### IV.C.2. El Laudo contiene razonamientos contradictorios

51. En diversas oportunidades el Tribunal incurrió en razonamientos contradictorios, lo que amerita la anulación del Laudo.[51]

52. Primero, el Tribunal también cae en contradicción grave al considerar, para ciertos efectos, a AES y los generadores como algo único y, para otros efectos, diferenciarlas. Así, al analizar

[47] Laudo, ¶¶ 542-548.

[48] Laudo, ¶ 548.

[49] Escrito Posterior a la Audiencia de Fondo de la República Argentina, ¶ 249.

[50] Contestación Actualizada, ¶¶ 371, 381, 468-469., Dúplica, ¶¶ 431, 515, 522, Escrito Posterior a la Audiencia de Fondo de la República Argentina, ¶¶ 5, 248.

[51] *Malicorp Limited c. República Árabe de Egipto*, Caso CIADI N° ARB/08/18, Decisión sobre la Solicitud de Anulación del 3 de julio de 2013, ¶ 45; *Ver también Maritime International Nominees Establishment c. República de Guinea*, Caso CIADI Nº ARB/84/4, Decisión de Anulación Parcial del Laudo del 22 de diciembre de 1989, ¶ 5.09.; *Klöckner Industrie-Anlagen GmbH y otros c. República Unida de Camerún y Société Camerounaise des Engrais*, Caso CIADI N° ARB/81/2, Decisión sobre Anulación del 3 de mayo de 1985, ¶ 116.

las renuncias y los argumentos referidos a consentimiento, estoppel y aquiescencia, el Tribunal destaca la distinción de la personalidad entre AES y sus generadores, para así concluir que los reclamos de AES fueron admisibles porque las renuncias realizadas por sus generadores no implican la suya.[52] Según el Tribunal, "[l]as entidades que asumieron compromisos respecto de la construcción, operación y mantenimiento de determinadas centrales o que aceptaron involucrarse, de acuerdo con las pruebas presentadas por la Demandada, fueron AES Argentina Generación S.A., AES Alicurá S.A., AES Juramento, C.T. AES Paraná, Hidrotérmica San Juan S.A. y Central Térmica San Nicolás S.A. El Tribunal entiende así que el cumplimiento de esos compromisos fue exigido a estas empresas o en general a AES Argentina Generación, S.A., y no a la Demandante".[53] Sin embargo, en múltiples ocasiones, por ejemplo, el Tribunal enfatizó el efecto que dicha medida habría tenido en los ingresos de los generadores equiparándolos a medidas respecto de AES. Por ejemplo, en relación con la Resolución 95/2013 el Tribunal afirmó que: "[a]ntes de aceptar esta Resolución, la situación de la Demandante era complicada y existía riesgo de quiebra [...] [l]os ingresos y las ganancias de la Demandante se vieron restringidos, lo que, a su vez, limitó, como mínimo, su dirección y explotación".[54] Asimismo, continúa: "AES siguió subsidiando a las centrales más pequeñas en aras de evitar su quiebra y se vio limitada en cuanto a la adquisición de combustible".[55] Incluso, en la Decisión sobre Jurisdicción, el Tribunal sostuvo que los generadores no solo eran propiedad de AES sino que los controlaba.[56] Teniendo ello en cuenta, si AES controla a los generadores, las conductas de ellos impactan en AES. Si, en cambio, se sostiene que la conducta de los generadores no impacta en AES, no puede entonces sostener que AES los controla.

53. El Tribunal también incurre en contradicción cuando analiza el texto de los acuerdos. Mientras que reconoce que el texto de las renuncias establece que la renuncia alcanza a "todas las acciones y/o reclamos", al mismo tiempo cuestiona que los acuerdos no establecen

---

[52] *Ver* Laudo, ¶¶ 161, 171-172.

[53] Laudo, ¶ 161.

[54] Laudo, ¶ 401; *Ver también* Decisión sobre Jurisdicción, ¶ 91 ("[...] contratos de concesión y a documentos conexos referentes a ciertas entidades (EDES, EDELAP, Alicurá e Hidroeléctrica San Juan), y ninguna otra de las [Entidades] de AES").

[55] Laudo, ¶ 401; *Ver también* Decisión sobre Jurisdicción, ¶ 93.

[56] Decisión sobre Jurisdicción, ¶ 84.

a qué se renuncia.[57] Sin embargo, si los acuerdos constituían una renuncia a todos los reclamos, no es necesario listar individualmente pues la renuncia abarca a todos, sin dejar nada por fuera.

54. Segundo, existieron contradicciones irreconciliables en materia de intereses. Por ejemplo, por un lado, el Tribunal determinó que "una tasa de interés libre de riesgo […] sería adecuada para lograr la reparación íntegra"[58] pero, al mismo tiempo, el Tribunal se contradice al decidir que el valor en el tiempo de los ingresos retenidos de los generadores sería compensado con intereses a la tasa del coste medio ponderado del capital (WACC por sus siglas en inglés) de AES (que incluye riesgo).[59] Aún más grave es que, al determinarlo, no se explica por qué el Tribunal afirmó que Argentina no indicó qué tasa de interés correspondía aplicar a dichos ingresos retenidos[60] cuando, en realidad, Argentina explicó en detalle por qué la tasa libre de riesgo debía ser siempre aplicable.[61] Es más, el Tribunal menciona que "[e]l silencio de la Demandada en este aspecto no rebate la razonabilidad de la metodología propuesta por la Demandante […]".[62] Más allá de ello, el Tribunal no ha desarrollado una explicación económico-jurídica de por qué debería aplicarse dicha tasa y por qué lo hace en este supuesto particular.[63] Por ello, el Tribunal incurre en una grave contradicción al considerar aplicable una tasa libre de riesgo y aplicar, al mismo tiempo, una tasa que incluye el riesgo.

55. Tercero, como se explicó más arriba en relación con el modelo elaborado por Quantum América, la determinación de daños efectuada por el Tribunal implica, en esencia, que este aceptó absolutamente todos los supuestos del modelo presentado por AES, puesto que el modelo se tomaba por completo o se descartaba, no era posible corregirlo o modificarlo. Esto implicó que también el Tribunal debió tomar la fecha de valuación de ese modelo.[64] Esto último lo llevó a incurrir en una contradicción puesto que el Tribunal determinó que

---

[57] Laudo, ¶ 163.

[58] Laudo, ¶ 573.

[59] Laudo, ¶ 556.

[60] Laudo, ¶ 565.

[61] *Ver*, por ejemplo, Contestación Actualizada, ¶¶ 884-894.

[62] Laudo, ¶ 555.

[63] Laudo, ¶ 565.

[64] *Infra*, § IV.B.

consideraría como fecha de valuación a la fecha del Laudo,[65] señalando que "no solo constituiría un error, sino que iría contra toda lógica establecer una fecha anterior a efectos de realizar una valuación de los daños derivados de un conjunto de medidas que continuaron materializándose".[66] Sin embargo, sin invocar fundamento ni motivo alguno, el Tribunal no calculó los daños a la fecha del Laudo sino al 31 de diciembre de 2020, casi 5 años antes de la fecha del Laudo.[67]

56. Al proceder de esta forma, el cálculo de daños del Laudo no contempla elementos fundamentales que habrían reducido el daño, como ser la asignación de valor a las participaciones que AES recibió de las centrales construidas en el marco del programa FONINVEMEM,[68] o el hecho de que la concesión de la central Alicurá finalizó en agosto de 2023,[69] no obstante lo cual AES continúa operándola hasta la actualidad.

### IV.C.3. El Laudo incluye razonamientos frívolos que equivalen a una ausencia de motivos

57. El Laudo brindó motivaciones frívolas que equivalen a una ausencia de motivos.[70]

58. Primero, respecto de la existencia de un nexo causal entre las medidas impugnadas y los daños sufridos, el Tribunal se limita a mencionar que "[e]n el caso que nos ocupa, el daño al margen de ganancia de la Demandante fue ocasionado por el contexto regulatorio creado por las medidas de la Demandada",[71] mencionando genéricamente que "[l]as medidas comprendieron las relativas a la formación de precios spot y al despacho, las exclusiones de las centrales que no fueran alimentadas con gas natural, así como el tope de precios spot, que, para el año 2013 colocaron a la Demandante en una situación crítica"[72] y limitándose a dar dos escuetos ejemplos adicionales de dichas medidas.[73] Con esa expresión genérica y carente de todo análisis, el Tribunal concluyó que existió un nexo causal suficiente para

[65] Laudo, ¶ 439.

[66] Laudo, ¶ 441.

[67] Laudo, ¶¶ 548, 556 y 602 ix.

[68] Laudo, ¶¶ 550-552; Contestación, ¶ 847; Dúplica, ¶¶ 986, 992, 994.

[69] Laudo, ¶ 85.

[70] *Maritime International Nominees Establishment c. República de Guinea*, Caso CIADI Nº ARB/84/4, Decisión de Anulación Parcial del Laudo del 22 de diciembre de 1989, ¶ 5.09.

[71] Laudo, ¶ 465.

[72] Laudo, ¶ 465.

[73] Laudo, ¶ 466.

atribuir responsabilidad internacional.

59. Segundo, el Tribunal también aborda frívolamente el escenario contrafáctico.[74] Por ejemplo, al concluir que las proyecciones de AES respecto de las exportaciones de gas fueron correctas en su totalidad, simplemente por considerar que las proyecciones de Argentina no lo fueron.[75] En relación con esa conclusión, el Tribunal no abordó, ni consideró o hizo mención alguna a las críticas del escenario contrafáctico de AES señaladas por Argentina. De forma idéntica a la falta de motivos determinada por el comité de *TECO c. Guatemala*, el Tribunal simplemente se limitó a mencionar los diferentes valores que los peritos de las partes calcularon para los dos escenarios y concluyó que no había "[fundamento] suficiente",[76] respecto de uno de ellos. Este es un ejemplo de cómo el Tribunal llega a sus conclusiones, ignorando relevantes hechos, elementos probatorios y argumentos traídos por las partes y determinantes para la resolución del caso mediante menciones superficiales, someras y frívolas que implican simplificaciones o generalizaciones excesivas de los planteos de las partes o de los puntos de disputa del caso, lo que equivale a no expresar motivos en los que se funda para arribar a sus conclusiones.

60. Tercero, al decidir si el programa FONINVEMEM era o no una medida arbitraria, el Tribunal se apoya en sus conclusiones respecto de otras medidas que nada tenían que ver con el FONINVEMEM. De este modo, el Tribunal concluye que el FONINVEMEM constituyó una medida arbitraria porque otras medidas (límites en el precio spot, exclusión de ciertas maquinas en la formación del precio spot y precios por potencias), no relacionadas al FONINVEMEM, eran arbitrarias.[77]

## V. SUSPENSIÓN DE LA EJECUCIÓN DEL LAUDO

61. Conforme al artículo 52(5) del Convenio CIADI, la República Argentina solicita que se

---

[74] Laudo, ¶ 529.

[75] Laudo, ¶ 529.

[76] *TECO Guatemala Holdings, LLC c. República de Guatemala*, Caso CIADI Nº ARB/10/23, Decisión sobre Anulación del 5 de abril de 2016, ¶ 130 ("El Tribunal simplemente se limitó a mencionar los diferentes valores que los peritos de las Partes calcularon para los dos escenarios y concluyó que no había "**evidencia suficiente**") (énfasis agregado); Laudo, ¶ 529 ("El Tribunal no considera que el extracto que señala la Demandada constituya **fundamento suficiente** para suponer que las exportaciones serían limitadas. En opinión del Tribunal, las proyecciones presentadas por la Demandante, así como la tendencia de las exportaciones, son razonables.") (énfasis agregado).

[77] Laudo, ¶ 334.

suspenda la ejecución de la totalidad del Laudo mientras la Solicitud de Anulación se encuentre pendiente de resolución. Asimismo, según lo dispuesto en el artículo 52(5) del Convenio CIADI y la Regla de Arbitraje 54(1), se solicita a la Secretaría General que notifique a las partes la suspensión provisional de la ejecución del Laudo.

## VI. Petitorio

62. En virtud de lo expuesto, la República Argentina solicita que:

(a) se anule el Laudo, del que forma parte la Decisión sobre Jurisdicción, de conformidad con el artículo 52 del Convenio CIADI y la Regla de Arbitraje 50;

(b) se suspenda la ejecución del Laudo hasta que el Comité *ad hoc* decida sobre su anulación, de conformidad con el artículo 52 del Convenio CIADI y la Regla de Arbitraje 54;

(c) la Secretaría General notifique a las partes la suspensión provisional de la ejecución del Laudo de conformidad con el artículo 52 del Convenio CIADI y la Regla de Arbitraje 54; y

(d) la Demandante pague todos los gastos y las costas que surjan de este procedimiento.

Respetuosamente presentado el 26 de septiembre de 2025.

Mag. Santiago M. CASTRO VIDELA
Procurador del Tesoro de la Nación

Dr. Julio Pablo COMADIRA
Subprocurador del Tesoro de la Nación

Mag. Juan Ignacio STAMPALIJA
Subprocurador del Tesoro de la Nación